UNITED STATES of America, Plaintiff,

v.

Barry Allen HUGHES, Defendant.

No. CR. S-90-0386-02-WBS.

United States District Court,
E.D. California.

July 10, 1991.

Richard Jenkins, U.S. Atty., Donald Searles, Asst. U.S. Atty., Sacramento, Cal., for plaintiff.

Clifford E. Tedmon, Tedmon & Tedmon, Sacramento, Cal., for defendant.

## MEMORANDUM RE SENTENCING

SHUBB, District Judge.

Defendant is before the court for imposition of sentence on Count I of the Indictment in this case, charging a conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 371, 1014, & 1344.

The facts of the offense are essentially undisputed. Defendant conspired with Richard Mittelman to cause three women to present falsified loan applications to federally insured institutions for the purpose of obtaining loans for the purchase of homes. The loan obtained by Mittelman's girlfriend, Roma Rutkowski for the purchase of a home at 2880 Highway 193, in Lincoln, California was for $150,000. This home was ostensibly purchased for Rutkowski and Mittelman to live in together. Defendant's girlfriend, Priscilla Baptista obtained two loans, one in the amount of $83,100 for the purchase of a home at 304 Hemphill Way in Roseville, California, and another in the amount of $241,600 for the purchase of a home at 202 Merrow Court in Auburn, California. The Roseville home was for Baptista to live in, and the Auburn home was for Mittelman's son and daughter-in-law. Defendant's more recent girlfriend, Joanne Andrews obtained a loan in the amount of $116,910 to purchase a home at 1743 Third Street in Lincoln, California. This home was for Andrews and defendant to live in together with her daughter.

The purpose of the loans was to obtain homes in which defendant and Mittelman, their respective girlfriends, and Mittelman's relatives would live. There was no desire, intent or expectation by defendant that any of the loans go into default. In fact, the home at 2880 Highway 193 in Lincoln purchased by Rutkowski was sold as part of Mittelman's bankruptcy proceedings at a profit of approximately $120,000

after all loans and costs were satisfied. Baptista still lives in the home at 304 Hemphill Way in Roseville, and its current fair market value has increased to the range of $142,500 to $145,000 as against the current loan balance of $82,000. The home at 202 Merrow Court in Auburn purchased for Mittelman's son was abandoned and later sold for $269,000; after all loans and costs were paid a profit was still made on the sale. Finally, defendant and Andrews are still living in the home at 1743 Third Street in Lincoln, the loan is still in good standing, and the fair market value of the home has increased to approximately $155,000 against a loan balance of $116,700.

■ It is agreed that the applicable offense guideline section is § 2F1.1 (Fraud and Deceit) and the base offense level is 6 under § 2F1.1(a). It is also agreed that the offense level should be increased by two levels for more than minimal planning under § 2F1.1(b)(2)(A) and that defendant is entitled to a two level downward adjustment for acceptance of responsibility. The only issue in dispute is whether the offense level should be increased an additional 10 levels under § 2F1.1(b)(1)(K) based upon a "loss" of $591,610, the total amount of the loans.

■ "Loss" is a specific offense characteristic under § 2F1.1(b)(1). Not only actual loss, but also "probable" or "intended" loss may be considered. *See* Application Note 7 to § 2F1.1; *United States v. Davis*, 922 F.2d 1385, 1391–92 (9th Cir.1991); *United States v. Wilson*, 900 F.2d 1350, 1355 (9th Cir.1990); *United States v. Wills*, 881 F.2d 823, 827 (9th Cir.1989). Case law outside of this Circuit has extended this to

include "intended, probable, or otherwise expected loss". *United States v. Schneider*, 930 F.2d 555, 558 (7th Cir.1991). There is no authority, however, for extending the definition of "loss" under § 2F1.1(b)(1) to include all possible or potential loss.[1] To the contrary, Application Note 2 to § 2X1.1 (relating to attempt, solicitation or conspiracy) allows for consideration of only those specific offense characteristics which were specifically intended or actually occurred; it forbids consideration of speculative specific offense characteristics.

■ Section 2F1.1(b)(1) applies to increase the offense level only where there is an actual, intended, probable, or expected loss. Since loss is described in terms of dollar amounts, it must be inferred that only economic loss may be considered under that subsection. There has been no actual economic loss to any of the lending institutions as a result of any of the loans in question.[2] Primarily because of rising property values in the area, the loans were paid off in full on the two homes that were sold, and the other two loans are still in good standing.

■ "Intended" must be interpreted as relating to the state of mind of the defendant at the time of the offense. At the time of the offenses here, defendant did not intend for the banks to suffer any economic loss as a result of the loans. Much to the contrary, in order for the banks to incur a loss on foreclosure, it would have meant that the girlfriends or relatives of defendant or Mittelman would have to lose their homes along with the down payments they had made on the homes. That is not at all what defendant intended to happen.

---

**1.** A cursory reading of West's headnotes in *United States v. Johnson*, 908 F.2d 396 (8th Cir.1990) would suggest that the court there used the possible loss to secured creditors to increase the offense level under § 2F1.1(b)(1), but a more thorough reading of the decision itself reveals that the court specifically focused "on the amount of the possible loss which Johnson *attempted* to inflict". *Id.* at 398 (emphasis added) (citing to Application Note 7 of § 2F1.1 which provides that "if a probable or intended loss that the defendant was attempting to inflict can be

determined, that figure would be used if it was larger than that actual loss"). Thus, it appears that it was in fact the probable or intended loss which the court in *Johnson* used to increase the offense level.

**2.** Priscilla Baptista has submitted a letter suggesting that she suffered losses as a result of the conduct of defendant. Section 2F1.1(b)(1) contemplates loss to victims, however—not accomplices.

Whether a loss is "probable" must be determined by a more objective standard, looking at the probabilities at the time of sentencing. The Government has the burden of proving by a preponderance of the evidence that loss is probable, and if so the amount of the probable loss. *See Schneider*, 930 F.2d at 559. In this case, in light of the favorable loan to value ratios it does not appear probable that any of the banks will incur any loss even if the two homes upon which loans still remain were to be placed in foreclosure.

"Expected" loss is by definition a more subjective standard. In holding that the courts may also look to "otherwise expected loss", it is not clear whether the court in *Schneider* intended to refer to the expectation of the defendant, the victim, a third person, or the court itself. It is also unclear whether the court meant to refer to the expectation at the time of the offense, at the time of imposition of sentence, or at some other time. The most relevant expectation would appear to be that of the defendant at the time of the offense. In the present case, however, the court finds that for the same reasons that defendant did not intend for the banks to incur any losses he did not expect them to incur any losses as a result of the subject loans.

The Government argues that the total amount of the loans should be considered as a "loss" under Application Note 2 to § 2B1.1, which defines a loss as "the value of the property taken, damaged, or destroyed." Application Note 7 to § 2F1.1 refers to the commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft) for valuation of loss, but that commentary is not very helpful in determining whether there has been a loss in the context of fraud and deceit. In the context of the present case, there was no property taken, damaged or destroyed.

In *Schneider*, the court distinguished between two types of fraud. One is where the offender—"a true con artist"—does not intend to perform his undertaking and intends to pocket the entire contract price without rendering any service in return. The other type is committed in order to obtain a contract that the offender might otherwise not obtain, but the offender meant to perform. In the first type of case, the court acknowledged that the contract price is a reasonable estimate of the expected loss. In the second type of case, however, the court found that there was no loss within the meaning of § 2F1.1(b)(1).

In a typical case of larceny, embezzlement, or theft, the offender by definition intends to cause the victim to part with his or her property. That is why, as stated in the background notes to § 2B1.1, the value of property taken plays an important role in determining sentences for theft offenses. They are more akin to the first type of case described in *Schneider*. The present case is more closely akin to the second type of case, where property has not been "taken" in the same sense as in a theft case. Like the defendants in *Schneider* who got contracts, defendant in this case took (or caused to be taken) no more than loans. As in *Schneider*, the defendant here may have exposed the banks to an increased risk, but the Government has made no effort to quantify that risk.

No authority in this circuit deals directly with the question of whether the offense level should be increased according to the total amount of the loans in cases such as this. The most recent case in this circuit dealing with § 2F1.1(b)(1) is *United States v. Cambra*, 933 F.2d 752 (9th Cir.1991). There, the defendant was charged with selling counterfeit steroids and distributing misbranded human growth hormones with intent to defraud and mislead. It was stipulated that the dollar value of the steroids or counterfeit steroids was $500,000. On appeal, defendant argued that it was inappropriate to increase the offense level under § 2F1.1(b)(1) because fraud on federal enforcement agencies was not financial in nature. The court rejected that argument, holding that federal agencies and individual consumer victims may both be victims of fraud. Since the steroids defendant sold or intended to sell were all either counterfeit or misbranded, there was an actual or intended loss in that consumers were caused (or defendant intended to cause them) to

pay for a product which they would not receive. The application of § 2F1.1(b)(1) to increase the offense level in that case therefore appears not to be inconsistent with the approach taken by the court herein.

The Government nevertheless suggests that the correct approach in order to arrive at an appropriate sentence would be to increase the offense level by 10 levels under § 2F1.1(b)(1)(K) and then depart downward pursuant to Application Note 10 to § 2F1.1. A downward departure pursuant to Application Note 10 would be warranted in cases where a "dollar loss" had been established but, for any one of a number of reasons, it overstated the seriousness of the offense. Here, however, that note is not applicable because the court finds no loss under § 2F1.1(b)(1).

The guidelines do not allow for increasing the offense level by the amount of the loans, absent some showing of actual, intended, probable or expected loss. To do so in cases of fraud and deceit would not only be inconsistent with the express language of § 2F1.1 and the Commentary thereto, but would also be inharmonious with the guidelines and commentary pertaining to bribery in the procurement of bank loans set forth in § 2B4.1. The Background notes to § 2B4.1 state:

> ... if a bank officer agreed to the offer of a $25,000 bribe to approve a $250,000 loan under terms for which the applicant would not otherwise qualify, the court, in increasing the offense level, would use the greater of the $25,000 bribe, and the savings in interest over the life of the loan compared with alternative loan terms.  ·

If the full amount of the loan is not used to increase the offense level in cases where the bank officer approves the loan pursuant to a bribe, it would make little sense to use the full amount of the loan to increase the offense level where the officer causes the loan to be approved through fraud.

It has been pointed out that Congress, in section 2507 of the Crime Control Act of 1990 (S. 3266–74), has instructed the Sentencing Commission to promulgate guidelines or amend existing guidelines so as to assign not less than offense level 24 if the defendant derives more than $1,000,000 *in gross receipts* from the offense. The Sentencing Commission has not yet implemented this directive. However, it apparently plans to do so simply by adding Application Notes to §§ 2B1.1(b), 2B4.1(b) and 2F1.1(b). The proposed Application Note to § 2F1.1(b) would read as follows:

> (7) If the defendant (A) is convicted of violating 18 U.S.C. §§ 1005, 1006, 1007, 1014, 1032, 1341 (if affecting a financial institution), or 1344 and (B) personally derived more than $1,000,000 in gross receipts from the offense, and the · offense level as determined above is less than level 24, increase to level 24.

This note has no application to the present case because it has not yet been promulgated, and even if it were it would by its terms have no application to cases such as this where the defendant's gross receipts were less than $1,000,000.

Neither section 2507 of the Crime Control Act of 1990 nor the proposed application note implementing it convinces the court that Congress or the Sentencing Commission intended the courts to use a defendant's gross receipts generally in increasing the offense level. To the contrary, both the statute and the note are expressly limited to cases where the defendant has derived more than $1,000,000 in gross receipts. If Congress or the Commission had wanted the courts to use gross receipts to increase the offense level in other situations they would have said so. "Gross receipts" are not the same thing as "loss". The court has no reason to doubt that the Sentencing Commission understands the difference. When the Commission refers to loss in § 2F1.1(b)(1) and the existing application notes the court must infer it means *loss* and not gross receipts.

For the foregoing reasons, the court finds that the base offense level is 6, the total offense level is 8, and the adjusted offense level is 6.