**UNITED STATES of America, Appellee,**

v.

**Lewis Donald SHATTUCK,
Defendant, Appellant.**

**No. 91–1833.**

United States Court of Appeals,
First Circuit.

Heard Feb. 6, 1992.

Decided April 22, 1992.

Paul F. Markham, Boston, Mass., for defendant, appellant.

Lon F. Povich, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Appellant challenges the concurrent twenty-seven month sentences imposed under the Sentencing Guidelines following his conviction on forty felony counts charging bank fraud, *see* 18 U.S.C. § 1344, misapplication and embezzlement of bank funds, *see* 18 U.S.C. § 656, or causing false entries in the records of a federally insured bank, *see* 18 U.S.C. § 1005. Appellant contends that the district court's refusal to conduct an evidentiary hearing to deter-

mine the amount of "victim loss" occasioned by his criminal conduct constituted an abuse of discretion and that the court applied an incorrect legal standard in its calculation of "victim loss." We affirm.

## I

## BACKGROUND

Appellant was a Vice President and Senior Lending Officer with the Bank of New England ("BNE"), specializing in commercial real estate loans. All of the crimes for which appellant was sentenced involved misapplications of BNE funds in connection with five commercial real estate loan transactions.[1]

## II

## DISCUSSION

Generously construed, appellant's brief presents two issues for consideration.

### A. *Evidentiary Hearing*

Before the presentence report ("PSR") was ever submitted, appellant asked the district court to conduct an evidentiary hearing to "determine the amount of loss" occasioned BNE. The request for hearing contained no evidentiary proffer, beyond its conclusory allusion to evidence adduced during the jury trial at which the sentencing judge presided.[2] The district court declined to conduct an evidentiary hearing.

The PSR recommended that the "victim loss" calculation be set at approximately $721,000, within the $500,000 to $1,000,000 range for which an eight-level enhancement is indicated.[3] *See* U.S.S.G. § 2F1.1(b)(1)(I). Appellant's entire challenge to the "victim loss" calculation in the PSR consisted of a *verbatim* reassertion of the grounds stated in support of the previous request for hearing, *see supra* note 2, once again without an evidentiary proffer. Moreover, throughout the sentencing proceedings defendant proposed no alternative "victim loss" calculation.[4] The ultimate "victim loss" calculation by the district court—"something over $700,000"—closely mirrored the PSR recommendation.

The denial of an evidentiary hearing on a sentencing guideline issue is re-

---

1. Appellant's concurrent twenty-seven month prison terms were calculated as follows: a base offense level of six, *see* U.S.S.G. § 2F1.1(a); a two-level enhancement for "more than minimal planning," *see id.* § 2F1.1(b)(2)(A); a two-level increase for abuse of trust, *see id.* § 3B1.3; *an eight-level increase for victim loss between $500,-000–$1,000,000, see id.* § 2F1.1(b)(1)(I) (rev. ed. 1988); and a category-I criminal history, *see id.* § 4A1.1. As sentencing occurred on July 17, 1991, the November 1990 Sentencing Guidelines were applied. *See* 18 U.S.C. § 3553(a)(4) (1988).

2. The request for hearing argued that "the amount of loss is the key determinant in arriving at the sentence to be imposed in the case under section 2F.1(b)(1) [sic]." The request further represented as follows:

   [C]onsiderations of the alleged victim's loss and the Defendant's gain ... are of paramount importance at the sentencing stage of the prosecution and *remain as facts to be proved by the government.*
   The *evidence at the trial* showed that most of the money advanced by the Defendant in violation of the construction loan agreements were [sic] either applied to reduce [a coconspirator's] indebtedness to the bank or were [sic] dissapated [sic] by [the coconspirator] without the Defendant's knowledge or approval. *Additionally, the failure of the real estate*

   *market was a significant, if not major, cause of the bank's loss.* The Defendant neither approved the loans involved or [sic] the collateral used to secure them so that any question concerning the loans themselves or the adequacy of the collateral is immaterial. (emphasis added).

3. In the PSR, BNE's losses were calculated as follows: counts 1–9, $83,000 improperly advanced notwithstanding prior nullification of the loan commitment; counts 10–13 and 15–33, $462,405, representing the amount written off by BNE, which included "kickbacks" to appellant ($90,000), the loan funds authorized, but not applied, to develop the property ($230,000), the funds loaned to purchase the lots ($330,000), less $200,000 BNE recovered on foreclosure; count 34, $148,128, the amount written off by BNE after it had discharged its mortgage unaware that appellant had misapplied the proceeds from the sale of the mortgaged property; counts 37–39, $15,000; and, finally, counts 42–43, $12,700.

4. After receiving further submissions and argument from counsel at sentencing, the court determined that no issues relating to the amount of "victim loss" remained in dispute and that no legal issues, including issues relating "to guideline applications as stated in the PSI," remained in dispute.

viewable only for "abuse of discretion." *See United States v. Gerante*, 891 F.2d 364, 367 (1st Cir.1989). The district court assuredly did not abuse its discretion. Appellant neither demonstrated that "[a]n evidentiary hearing [would] be the only reliable way to resolve" the "victim loss" calculation, *see* U.S.S.G. § 6A1.3, p.s., comment., nor that one would be useful. Although the sentencing court must afford the parties "an adequate opportunity to present information" as to "any factor important to the sentencing determination [which] is reasonably in dispute," U.S.S.G. § 6A1.3(a), p.s., affidavits, documentary exhibits, and submissions from counsel often suffice, *see id.* § 6A1.3, p.s., comment., even assuming that the opportunity to address the court, assured all criminal defendants (and counsel) at sentencing, would not. *See* Fed.R.Crim.P. 32(a)(1).

In the instant case, there can have been no abuse of discretion in the denial of an evidentiary hearing. First, the sentencing judge, having presided at trial, was intimately familiar with the only relevant evidence to which appellant alluded in either hearing request: *"[t]he evidence at the trial* showed that most of the money advanced by the Defendant in violation of the construction loan agreements were [sic] either applied to reduce [a coconspirator's] indebtedness to the bank or were [sic] dissapated [sic] by [the coconspirator] without the Defendant's knowledge or approval." (emphasis added).[5] At no time did appellant identify any evidence which would be presented at a hearing, so as to enable the district court to evaluate the usefulness of an evidentiary hearing. Although appellant made the conclusory assertion at sen-

tencing that he had figures which would establish his entitlement to a "victim loss" setoff, none were ever submitted, either below or on appeal. As counsel was free to present appellant's "victim loss" contention at the sentencing hearing,[6] and there was no showing that an evidentiary hearing would be necessary or even useful, the refusal to conduct an evidentiary hearing was well within the sound discretion of the district court.[7]

### B. *"Victim loss"*

■ We do not review sentencing guideline disputes which were not preserved before the district court. *See United States v. Dietz*, 950 F.2d 50, 55 (1st Cir.1991) (refusing to review "victim loss" calculation on a ground not seasonably raised below); *see also United States v. Uricoechea–Casallas*, 946 F.2d 162, 166 (1st Cir. 1991); *United States v. Pilgrim Market Corp.*, 944 F.2d 14, 21 (1st Cir.1991); *United States v. Fox*, 889 F.2d 357, 359 (1st Cir.1989). The "victim loss" theory asserted by appellant on appeal was never raised below.[8] We advert to the merits only to demonstrate that the "victim loss" analysis mentioned on appeal would be unavailing, on the present record, in any event.

On appeal, appellant's brief cursorily asserts that "the distinction ... [in *United States v. Hughes*, 775 F.Supp. 348 (E.D.Cal. 1991)] between losses in cases like the present one and losses in cases involving theft and larceny is valid and should be adopted by this court." Quite unlike appellant, however, the defendant in *Hughes* obtained a fraudulent bank loan in violation of 18 U.S.C. § 1344, but pledged valuable collateral to secure its repayment. *Id.* at

---

**5.** The district court expressly determined at sentencing that an evidentiary hearing was unwarranted in view of the court's thorough familiarity with the evidence and the theories presented at trial.

**6.** *See supra* note 4.

**7.** At sentencing, the district court determined, and appellant even now does not dispute, that approximately $721,000 was advanced in violation of the loan agreements. At oral argument it was conceded that appellant has yet to make an evidentiary proffer.

**8.** At sentencing, not only did appellant not advocate a distinction between the "victim loss" calculation utilized in fraud (§ 2F1.1) and theft (§ 2B1.1) cases, which forms the basis for the approach endorsed in *United States v. Hughes*, 775 F.Supp. 348 (E.D.Cal.1991), but he acquiesced when the district court made direct reference to U.S.S.G. § 2B1.1, comment. (n. 2), as providing the appropriate focus for its determination of "victim loss" on the basis of "the value of the property *taken....*" (emphasis added).

350. What appears to have concerned the *Hughes* court, as well as the Third Circuit in a somewhat similar case, *see United States v. Kopp*, 951 F.2d 521 (3d Cir.1991), is the problematic notion that the bank sustains "victim loss" equal to the total amount of the fraudulent loan, notwithstanding the fact that the defendant pledged valuable collateral to secure its repayment. The Third Circuit focused on the defendant's intent to "take" the victim's property as the key distinction between the "victim loss" analysis prescribed in fraud cases, U.S.S.G. § 2F1.1, comment. (n. 7), and that applicable in theft cases, U.S.S.G. § 2B1.1, comment. (n. 2).[9] *See also United States v. Badaracco*, 954 F.2d 928 (3d Cir.1992). The court explained that the "victim loss" guideline in fraud cases, U.S.S.G. § 2F1.1, comment. (n. 7), requires the sentencing court to approximate the "actual" loss sustained by the victim, or the reasonably calculable "probable" or "intended" loss, whichever is greater.[10]

When appellant misapplied BNE funds to unauthorized persons or purposes, he did not provide BNE with collateral to secure repayment of the unauthorized advances or diversions. Moreover, even if appellant were deemed to have raised, and neither waived nor abandoned, a *Hughes* claim, the "victim loss" determination would not have constituted reversible error.

Although not properly preserved below, nor mentioned on appeal, appellant adverted in the request for hearing, *see supra* note 2, to the distortive effect that real estate market conditions may have had on the actual amount of loss occasioned BNE.[11] Appellant never attempted to approximate the monetary impact for which these market conditions allegedly accounted, apparently assuming, erroneously so,[12] that the government would bear the burden of demonstrating whatever distortive effects might have resulted from market conditions. *See supra* note 2.

"[T]he victim loss table in U.S.S.G. § 2F1.1(b)(1) presumes that the defendant alone is responsible for the entire amount of victim loss specified in the particular loss range selected by the sentencing court." *United States v. Gregorio*, 956 F.2d 341, 346 (1st Cir.1992). Any

---

9. *Kopp* indicates that in determining whether the defendant's criminal conduct was akin to "fraud" it is important to consider whether he *pledged collateral to secure the loan. Kopp*, 951 F.2d at 528–29 ("§ 2B1.1 is, by definition, a theft guideline, and fraud differs from theft. In this case, ... the defendant did fraudulently obtain [the loan], but in so doing he simultaneously gave a mortgage on the property—an obligation that eventually forced him to forfeit the collateral to the bank"). The court accordingly concluded that the defendant did not intend to "take" from the bank the entire amount of the loan he had provided collateral to secure. *Kopp*, 951 F.2d at 528–29. The same was true of the defendant in *Hughes. See Hughes*, 775 F.Supp. at 350 (emphasizing that defendant did not intend to cause a loss which would result in foreclosure on his home).

10. As Judge Becker explained in *Kopp:*

Application Note 7 [governing fraud and embezzlement cases] is in fact consistent with the cross-reference to the theft guideline [§ 2B1.1]. *In both theft and fraud cases, the guideline "loss" turns out to be the higher of the actual loss and the intended loss.* Admittedly, the theft guideline does not state this approach in terms. But in a theft case, the thief *intends* to steal whatever he or she takes; the amount taken is the loss defendant intend-

ed to inflict (even though the defendant may not have known exactly the value on the market or to the victim of the things taken). Although the theft guideline does not tell the sentencing court to compare actual and intended loss, as the fraud guideline Commentary explicitly does, no comparison is necessary. In a theft case, unlike a fraud case, the amount taken (the intended loss) is always as high or higher than the amount the victim actually lost (which may be reduced due to fortuitous recovery of the stolen property.) *Kopp*, 951 F.2d at 529–30 (emphasis in original).

11. The entire conclusory reference states: "the failure of the real estate market was a significant, if not major, cause of the bank's loss." The hearing request neither identified the particular transactions allegedly affected by market conditions, nor estimated their monetary impact on the BNE loss.

12. *See United States v. Anders*, 956 F.2d 907, 911 (9th Cir.1992) ("The defendant bears the burden of proving the appropriateness of a downward departure."); *United States v. Rutana*, 932 F.2d 1155, 1159 (6th Cir.) ("[T]he burden of persuading the sentencing court that a downward departure is warranted rests with the defendant."), *cert. denied*, — U.S. ——, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991).

portion of the total loss sustained by the victim as a consequence of factors extraneous to the defendant's criminal conduct is *not* deducted from total "victim loss" prior to the determination of the applicable guideline sentencing range ("GSR") pursuant to U.S.S.G. § 2F1.1(b)(1). *Id.* at 347 ("victim loss" table encapsulates "heartland" sentencing formula for reflecting approximate total "victim loss" in GSR). Rather, whatever distortive effects extraneous causes may have had on the total "victim loss" calculation may warrant a *departure* from the applicable GSR. U.S.S.G. § 2F1.1, comment. (n. 10) ("downward departure may be warranted" where "total dollar loss that results from the offense may overstate its seriousness," which "typically occur[s]" when defendant's fraud "is not the sole cause of the loss"); *Kopp*, 951 F.2d at 531 ("To the extent actual loss had other, more proximate causes, a discretionary downward departure—but not a mandatory 'loss' adjustment—might be appropriate."); *see United States v. Carey*, 895 F.2d 318, 323 (7th Cir.1990) (*departure from GSR* warranted under § 2F1.1 where "defendant should not be held responsible for entire loss due to extrinsic reasons beyond his control"); *see generally, Gregorio*, at 345–348 (discussing U.S.S.G. § 2F1.1, comment. (n. 10) and rejecting claim that "multiple causation" should be considered in calculating the GSR, rather than as basis for departure). Notwithstanding the representation in the PSR that there were no grounds for downward departure, the appellant never requested a downward departure based on "multiple causation." Therefore, any "multiple causation" claim was waived. *See Dietz*, 950 F.2d at 55.

 Finally, the eight-level enhancement for "victim loss" is adequately supported. The district court findings set the total victim loss occasioned BNE at approximately $721,000, which triggered the eight-level enhancement under § 2F1.1(b)(1)(I) (rev. ed. 1988). *See supra* note 1. The record indicates that the amounts which were misapplied by appellant but *remained with* BNE, and thereby arguably were not "taken," *see Kopp*, 951 F.2d at 529; *Hughes*, 775 F.Supp. at 351, did not exceed $198,-700.[13] Thus, deducting the aggregate amount appellant arguably misapplied to other BNE accounts from the total "victim loss" calculation recommended in the PSR, and adopted by the district court,[14] *i.e.*, $721,000, and even assuming the correctness of appellant's view of the law, a matter we do not decide, the net "victim loss" substantiated by the record was not less than $522,000, well within the "victim loss" range selected by the district court. Accordingly, the eight-point enhancement for "victim loss" under the U.S.S.G. § 2F1.1(b)(1)(I) must be affirmed.

*Affirmed.*

---

**13.** The record on appeal enables us to discern the "victim loss" calculation adopted by the court at sentencing. The following analysis utilizes the district court calculation, but eliminates the amounts misapplied by appellant which *remained with* BNE. Under counts 1–9, approximately $32,000 was misapplied but remained with BNE; the $51,000 balance went outside the bank. Under counts 10–13 and 15–33, the total loss to BNE ($462,000) comprises three components. First, BNE lost approximately $142,000 following foreclosure on its collateral. Not more than $68,000 was misapplied within BNE and the remaining $252,000 consisted either of "kickbacks" to appellant or monies otherwise misdirected outside BNE. Under count 34, as much as $86,000 may have remained within BNE, and approximately $62,-000 was diverted outside BNE. Under counts 37–39, appellant received the entire $15,000 as a "kickback." Finally, since we are unable to determine otherwise from the record on appeal, we assume that the entire $12,700 involved under counts 42 and 43 was misapplied to other BNE accounts. Thus, no more than $198,700 remained with BNE.

**14.** *Cf. Kopp*, 951 F.2d at 530 ("fortuitous recovery" of property "taken" is irrelevant to calculation of victim loss); *United States v. Westmoreland*, 911 F.2d 398, 399 (10th Cir.1990) (where property has been taken, fact of "ultimate[ ] recover[y] by the victim" "should not affect the determination of the extent of defendant's culpability and responsibility for purposes of sentencing").