UNITED STATES of America,
Plaintiff–Appellee,

v.

Patricia S. CHICHY (92–3481); Shelton Galloway, Jr. (92–3497), Defendants–Appellants.

Nos. 92–3481, 92–3497.

United States Court of Appeals,
Sixth Circuit.

Argued June 21, 1993.

Decided Aug. 6, 1993.

James V. Moroney, Asst. U.S. Atty. (argued and briefed), Cleveland, OH, for plaintiff-appellee.

Richard G. Lillie (argued and briefed), Corso, Lillie & Kelly, Cleveland, OH, for defendant-appellant.

Before: MILBURN and BOGGS, Circuit Judges; and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Defendants-appellants, Patricia S. Chichy and Shelton Galloway, appeal their convictions and sentences for conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371 and for making false, fictitious, or fraudulent statements to an agency of the United States in violation of 18 U.S.C. §§ 1001 and 2. For the following reasons, we reverse in part and affirm in part.

I.

This case arose from a Federal Bureau of Investigation (FBI) investigation of fraudulent loan applications made by clients of Beachwood Realty in order to obtain FHA insured mortgage loans. Specifically, defendant Galloway was charged with attracting potential home buyers to his employer Beachwood Realty, promising applicants that they could obtain a loan by creating non-existent employment or artificially increasing the salary of existing employments, steering applicants to a co-conspirator loan officer at a mortgage company for loan applications and qualifications, and creating false and fraudulent income and employment documentation.

Specifically, defendant Chichy, a mortgage loan officer at the Centrust Mortgage Corp., was indicted because she knew or should have known of the false and fraudulent income and employment for numerous FHA loan applicants when she accepted loan applications signed by applicants while said forms were blank, failed to question applicants about employment and income during face-to-face loan application interviews in violation of HUD–FHA regulations, failed to verify income and employment documentation received from Beachwood Realty in violation of Centrust's regulations, and ignored truthful and accurate information provided to her by the loan applicants.

The procedure used by the United States Departments of Housing and Urban Development (HUD) and Federal Housing Administration (FHA) in offering a program of mortgage insurance for single-family housing for qualified buyer/applicants is as follows.[1] A purchaser seeking an FHA-insured mortgage loan selects a residence and executes a binding purchase agreement, specifying FHA financing for that property. Once the purchase agreement is executed, the realtor refers the purchaser to a mortgage company that is qualified as a direct endorser on behalf of HUD–FHA in order that the purchaser may make application for FHA financing. In offering mortgage insurance, HUD–FHA relies upon "direct endorsement" of mortgage loans by qualified mortgage companies, which take loan applications, document and verify those applications, and approve loans for FHA insurance. In so doing, a direct-endorsing company acts as an agent for HUD–FHA.

In the present case, it was alleged that Beachwood Realty, which was owned and operated by co-conspirators Earsie and Olin Walker, would direct its clients wishing to obtain HUD–FHA insured financing to either Centrust or Cornerstone Mortgage Company, which acted as direct endorsers of FHA mortgage loans from 1988 through 1990. Beachwood Realty directed the loan applicant to a specific "loan officer" or "loan originator" at the mortgage company, whose function in the scheme was to take the purchaser's application using fraudulent information that would be acceptable for FHA insurance purposes in assembling a loan package. From 1987 through October 1991, defendant Chichy was employed as a loan

1. A similar procedure is used by the Veterans Administration (VA). One of the loans charged in the conspiracy was a VA loan.

officer at Centrust Mortgage Corp. Co-conspirator John Storey was employed as the loan officer at Cornerstone Mortgage Co.

A standardized residential loan application form for an FHA insured loan requires the loan officer to certify that the loan officer took the loan application in a face-to-face interview with the borrower-applicant. HUD–FHA regulations require that the mortgage company obtain from, and verify with, the loan applicant the documents submitted to establish income and employment. Centrust therefore required verification of these documents, such as Forms W–2 and pay stubs, by the loan officer directly with the applicant at the time of the loan application, and also required the applicant to sign the loan application form at the time of the "face-to-face" loan application interview.

The FBI investigation of Beachwood Realty uncovered evidence of numerous fraudulent loan applications made by its clients between April 1988 and March 1990. The client-loan applicant would be provided by Beachwood Realty with false documentation of jobs that did not exist, such as false Forms W–2 and pay stubs, or the applicant's salary would be drastically inflated for jobs the applicants actually held. Affordable Alarms, which was owned by defendant Galloway and operated on the premises of Beachwood Realty, was one of the front companies used to create false jobs and incomes which did not exist for the loan applicants. Other companies included Boyd Construction Company, Todd Moving Company and Joe's Place. Clients of Beachwood Realty would be directed to either defendant Chichy at Centrust or co-conspirator John Storey at Cornerstone, who would assist in the preparation of a loan application which contained false employment information or contained income and employment figures not verified or provided by the loan applicant.

The FBI investigation led to the return of a 27–count indictment on October 1, 1991, against Olin and Earsie Walker, Galloway, Storey, and Chichy. Trial was set for December 16, 1991, but on December 7, 1991, Olin Walker died. On December 19, 1991, a superseding indictment was returned against the remaining four defendants. The su-

perseding indictment contained in count 1 a conspiracy charge against Earsie Walker, Galloway, Storey, and Chichy, which encompassed 25 fraudulent mortgage loans. The superseding indictment also included 20 substantive counts of making and causing to be made false statements in connection with FHA and VA loans.

On January 21, 1992, co-conspirators Storey and Earsie Walker pled guilty to two substantive counts pursuant to an agreement that the remaining counts against them would be dismissed at the time of sentencing. Trial then commenced on January 21, 1992 for defendants Galloway and Chichy.

On February 10, 1992, the jury returned verdicts of guilty against defendant Chichy on counts 1 (the conspiracy), 3 (the Jasper loan), 4 (the Brown loan), 5 (the Austin loan), 16 (the Saafir loan), 18 (the Warren loan), and 21 (the Allen loan). On the same day, the jury found Shelton Galloway guilty on counts 1 (the conspiracy), 2 (the Hubbard loan), 9 (his own loan), 11 (the Shahid loan), 19 (the Samuels loan) and 20 (the Summers loan).

At a sentencing hearing conducted for both defendants on May 12, 1992, the United States presented evidence that HUD–FHA had already paid a claim of $57,150 on the Brown loan (count 4), and that the Austin loan (count 5), the Hubbard loan (count 7), as well as the Brooks loan (included in count 1, but not charged as a substantive count) had gone into default, a step immediately prior to foreclosure.

The district court, at the conclusion of the sentencing hearing, enhanced each defendant's base offense level by two levels for role in the offense under U.S.S.G. § 3B1.1(c) and two levels for more than minimal planning under U.S.S.G. § 2F1.1(b)(2). The base offense level for fraud and deceit under U.S.S.G. § 2F1.1 is 6. An enhancement is to be made according to a table based on the amount of loss. In the present case, the total overall adjustment based on the calculation of the loss was a six-level enhancement based on an estimate by the district court that the actual loss incurred by HUD–FHA

would be in the range of $70,000–$120,000.[2] With a total base offense level of 16 and a Criminal History Category of I, the sentencing range for each defendant was 21–27 months. The district court then sentenced defendant Chichy to 21 months imprisonment and defendant Galloway to 24 months imprisonment with two years' supervised release to follow each sentence.

Both defendants timely filed an appeal.

## II.

Defendants' first assignment of error is that there is insufficient evidence to sustain their convictions on each count.[3] The standard for reviewing a claim of insufficient evidence "is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt." *United States v. Martin,* 897 F.2d 1368, 1373 (6th Cir.1990). *United States v. Glasser,* 315 U.S. 60, 66, 62 S.Ct. 457, 463, 86 L.Ed. 680 (1942); *United States v. Faymore,* 736 F.2d 328, 334 (6th Cir.), *cert. denied,* 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984). This is a very difficult burden to overcome. In the present case, there is substantial evidence on the record from which the jury could have inferred each defendant's guilt.

Numerous witnesses who had been involved in the investigation of the fraudulent loan application scheme testified against defendants Chichy and Galloway at trial. The United States presented in its case-in-chief the testimony of official representatives of HUD–FHA and VA, and of representatives for Centrust and Cornerstone. Lee Federle of BRI, Business Risks International, who had been hired by Centrust Mortgage Corp., testified about his investigation of the Saafir loan, which triggered the FBI investigation. All of the loan applicants for the loans charged in the conspiracy count of the superseding indictment testified, except for the two applicants who could not be located for trial, Arlena Dixon, and Shelton Galloway (the defendant). Peter Washington, James Todd, and Leroy Boyd testified to their respective ownerships of Joe's Place, Todd Moving Company, and Boyd Construction about their dealings (or lack thereof) with Olin Walker and Shelton Galloway in connection with using businesses as fronts for false employment and about the attempts to verify income and employment for various loan applicants. Representatives of the U.S. Social Security Administration and the Internal Revenue Service also testified. FBI Special Agent Babetta D. Chiarito testified about her investigation of Beachwood Realty and about admissions made by defendant Chichy in the course of two interviews.

More specifically, in regard to defendant Chichy, the testimony of loan applicants Nathaniel Brown, Patricia Austin, and Linda Warren indicated that false information, which was contrary to the true information they provided during their face-to-face interview with defendant Chichy, was placed on their loan applications after their face-to-face interviews with her. Their testimony indicated that although correct pay stubs and income statements were provided to defendant Chichy, this information was not shown on their loan applications, but instead their

---

**2.** The district court first increased the base offense level by 12 based on the face value of the total amount of the mortgage loans at issue in the conspiracy—$1,563,000. However, the district court then departed downward six levels on the ground that the actual "loss here will not be anything approaching $1,563,000." The district court estimated that the actual loss would not be more than $120,000 and departed downward accordingly. The net effect of the district court's actions was to increase each defendant's base level for fraud and deceit under U.S.S.G. § 2F1.1 by 6 levels based on an estimated actual loss of $70,000–$120,000.

**3.** Defendant Chichy's argument that the indictment was insufficient has no merit. An indictment as drafted is presumed sufficient if it tracks the statutory language, cites the elements of the crimes charged, and provides approximate dates and times. *United States v. American Waste Fibers Co.,* 809 F.2d 1044, 1046 (4th Cir.1987) (per curiam); *United States v. Beebe,* 792 F.2d 1363, 1366, n. 4 (5th Cir.1986); *United States v. Love,* 815 F.2d 53, 55 (8th Cir.), *cert. denied,* 484 U.S. 861, 108 S.Ct. 177, 98 L.Ed.2d 130 (1987); *United States v. Largent,* 545 F.2d 1039, 1043 (6th Cir.1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1117, 51 L.Ed.2d 546 (1977). The indictments in the present case are clearly sufficient based on these criteria.

applications were supported by fraudulent Forms W–2 and pay stubs or other false information, such as the amount of child support or a "gift affidavit" from a boy friend, not provided by the loan applicants. In other instances the income for existing jobs had been vastly inflated. When all reasonable inferences of this testimony are construed in favor of the government, a reasonable juror could conclude that defendant Chichy knowingly falsified and approved the loans with false income and employment information, signed these applications, and then submitted them to Centrust's underwriting department.

The testimony of Rodney Jasper, Olivia Saafir, and Herman Allen indicated that they knowingly presented fraudulent loan applications supported by false Forms W–2 and pay stubs, containing various irregularities and discrepancies, which defendant Chichy failed to question them about in their face-to-face interviews with her and which she failed to verify as required. Because these documents contained the same deficiencies such as flaws in the copying of documents, irregularities in the typing of the false Forms W–2, bold face type on what was supposed to have been employee copies of actual Forms W–2, different references in two separate years to the name of the employer, and incorrect social security computations, and each loan applicant testified that defendant Chichy did not ask the required questions, a reasonable juror could infer that defendant Chichy knew the income and employment information was false and had been fabricated by Beachwood Realty, but approved the loan anyway.

In regard to defendant Galloway, witness Abdul Shahid testified that Galloway told him he would concoct a false job and income statement for him which was presented on his loan application, and that he never met with Olin Walker, the owner of Beachwood Realty, but dealt exclusively with defendant Galloway in making a fraudulent loan application. Roshell Samuels testified that Galloway told her that Beachwood Realty would come up with "some type of job for her" and income verification forms in order to obtain a FHA-insured loan. Angela Summers testified that Galloway told her he would help her get a house by giving her a false job as a cook at Joe's Place and then showed her a loan application, which falsely reported her employment and income as a chef at Joe's Place earning $28,000 per year, even though she had never worked at Joe's Place and even though she had given her true pay stubs from her true employment to Galloway. In regard to his own loan application, Galloway submitted Forms W–2 from Beachwood Realty for 1987 and 1988 and copies of federal income tax returns for those years which were false, as neither the Forms W–2 nor tax returns had been filed with the IRS. This evidence supports a conclusion that defendant Galloway tried to obtain for himself an FHA-insured loan with false and fraudulent documentation. Finally, in regard to the application of Russell Hubbard, which falsely listed as his employer Affordable Alarms, there was sufficient evidence to establish that Affordable Alarms and Beachwood Realty were joint enterprises of Olin and Earsie Walker and defendant Galloway, and that defendant Galloway knew or should have known that Affordable Alarms was being used as a front for Hubbard's employment.

Based on this testimony and other evidence that was produced with regard to the operation of the fraudulent loan scheme, the jury could conclude that defendants Chichy and Galloway were both guilty on the conspiracy count and that each defendant was guilty of the substantive counts for which he or she was convicted. The district court is affirmed on this issue.

## III.

■ Defendants next contend that the district court erred in increasing each defendant's offense level two levels for more than minimal planning under U.S.S.G. § 2F1.1(b)(2) in addition to a two level enhancement for aggravating role in the offense under U.S.S.G. § 3B1.1(c).

In the present case, the district court enhanced each defendant's offense level under U.S.S.G. § 2F1.1(b)(2), which states that "if the offense involved (A) more than minimal planning, or (B) a scheme to defraud more than one victim, increase by 2 levels." Application Note 2 states that "More than minimal planning" is defined in the commentary to

§ 1B1.1, which states that more than minimal planning is "deemed present in any case involving repeated acts over a period of time." Because both defendants were involved in repeated false loan applications over a two-year period of time, the district court applied this adjustment to both defendants.

The district court also enhanced each defendant's offense level by two levels under U.S.S.G. § 3B1.1(c), which provides:

§ 3B1.1. *Aggravating Role*

Based on the defendant's role in the offense, increase the offense level as follows:

(a) if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

Defendants contend that enhancements under both these guidelines constitutes impermissible double counting for the same conduct, relying on *United States v. Romano*, 970 F.2d 164, 167 (6th Cir.1992), in which this court stated that "if certain conduct is used to enhance a defendant's sentence under one enhancement provision, the defendant should not be penalized for the same conduct under a separate provision." In *Romano*, this court found improper separate enhancements for role in the offense as an organizer or leader under § 3B1.1(a) and more than minimal planning under § 2F1.1(b)(2), because more than minimal planning, the conduct that is taken into account under § 2F1.1(b)(2), is also required to qualify as an organizer under § 3B1.1(a). *Id.* The rationale behind *Romano* is that a defendant should not be penalized for the same conduct under two different guideline provisions.

The government argues that *Romano* is distinguishable from the present case because the present case was decided under subsection (c) of § 3B1.1 rather than under subsection (a), and the district court, in applying the more than minimal planning provision of § 2F1.1(b)(2), focused on the fact that the scheme involved repeated acts over a period of time. We find it difficult to distinguish *Romano* for the following reasons. Although we recognize that an argument can be made that an enhancement for aggravating role in the offense as an organizer, leader, manager, or supervisor under § 3B1.1 requires additional actions on the part of a defendant other than "more than minimal planning" and that giving people orders is not the same as planning, we believe the *Romano* court took this argument into consideration and rejected it, and we feel we are bound by *Romano*. This court in *Romano* held that to be considered an organizer or leader under subsection (a) of § 3B1.1, a defendant would necessarily have to engage in more than minimal planning and that "[n]othing in the Guidelines or its commentary indicates the Sentencing Commission intended cumulative punishment" for the same conduct. *Id.* We believe the same reasoning applies to subsection (c) of § 3B1.1. The primary difference between subsection (a) and subsection (c) is the number of people involved in the conspiracy, and the role of "organizer" and "leader" is considered under both subsections. An enhancement for the role of "manager" and "supervisor" is also provided for under subsection (c), but under the reasoning of *Romano*, it also necessarily requires that the defendant be engaged in more than minimal planning, which in the present case has already been taken into account by the enhancement under § 2F1.1(b)(2). Under the logic of *Romano*, this results in impermissible double counting for the same conduct. Although it is possible for a defendant to receive an enhancement under § 2F1.1(b)(2) for more than minimal planning without being an organizer, leader, manager, or supervisor under § 3B1.1(c), the converse is not true. A defendant cannot receive an enhancement for role in the offense under § 3B1.1(c) unless he has engaged in more than minimal planning.

Because we believe this case is governed by *Romano*, we reverse the district court and remand for resentencing. A two-level enhancement is warranted under either U.S.S.G. § 3B1.1(c) or § 2F1.1(b)(2), but not under both guidelines.

## IV.

Finally, defendants contend that the district court erred in determining the enhancement for the amount of loss under U.S.S.G. §§ 2X1.1 and 2F1.1(b).

In the present case, both defendants Chichy and Galloway were convicted of the conspiracy count and of various substantive counts involving specific fraudulent loan applications. Under U.S.S.G. § 3D1.2(b), the substantive counts of conviction for each defendant were properly grouped with the conspiracy count. *See* U.S.S.G. § 3D1.2, Application Note 4. Accordingly, the sentencing court was required only to consider conduct relevant to the conspiracy convictions in determining the defendants' sentences. The guideline for conspiracies, attempts, and solicitations (§ 2X1.1) states in relevant part that the base offense level should be "the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." Application Note 2 to this guideline states that "substantive offense"

means the "offense that the defendant was convicted of . . . conspiring to commit."

The United States argues that the guideline for the underlying substantive offense in the present case is found at U.S.S.G. § 2F1.1, the guideline for fraud and deceit. In considering the specific offense characteristic for the amount of the loss under U.S.S.G. § 2F1.1(b)(1), Application Note 7 provides that "consistent with the provisions of § 2X1.1 . . ., if an intended loss that the defendant was attempting to inflict can be determined, that figure will be used if it is greater than the actual loss." The government argues that in the present case, the intended loss was the total amount of the fraudulent loans "attempted, caused, or otherwise carried out," in other words, the face value of the total proceeds of all the mortgage loans charged in the conspiracy count, which amounted to $1,563,000. The government argues that therefore each defendant's base offense level should be increased by 12 levels pursuant to the table found at U.S.S.G. § 2F1.1(b)(1)(M).[4]

A twelve-level increase based on the face value of all the mortgage loans charged in the conspiracy count is clearly erroneous in the present case because of an amendment to Application Note 7, which the government ignores. As of November 1, 1991, U.S.S.G. § 2F1.1 was amended to provide for exceptions to the statement relied on by the gov-

---

4. The table at § 2F1.1 states:

(b) Specific Offense Characteristics
(1) If the loss exceeded $2,000, increase the offense level as follows:

| Loss (Apply the Greatest) | Increase in Level |
|---|---|
| (A) $2,000 or less | no increase |
| (B) More than $2,000 | add 1 |
| (C) More than $5,000 | add 2 |
| (D) More than $10,000 | add 3 |
| (E) More than $20,000 | add 4 |
| (F) More than $40,000 | add 5 |
| (G) More than $70,000 | add 6 |
| (H) More than $120,000 | add 7 |
| (I) More than $200,000 | add 8 |
| (J) More than $350,000 | add 9 |
| (K) More than $500,000 | add 10 |
| (L) More than $800,000 | add 11 |
| (M) More than $1,500,000 | add 12 |
| (N) More than $2,500,000 | add 13 |
| (O) More than $5,000,000 | add 14 |
| (P) More than $10,000,000 | add 15 |
| (Q) More than $20,000,000 | add 16 |
| (R) More than $40,000,000 | add 17 |
| (S) More than $80,000,000 | add 18. |

ernment in Application Note 7 that "consistent with the provisions of § 2X1.1 ..., if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." One of the exceptions to this statement deals with fraudulent loan application cases such as the present case. The amendment to Application Note 7 states in relevant part:

(b) *Fraudulent Loan Application and Contract Procurement Cases*

In fraudulent loan application cases and contract procurement cases where the defendant's capabilities are fraudulently represented, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan.[5]

■ Based on this amendment, defendant Chichy's and Galloway's base offense levels should have been increased based on the actual or expected loss to HUD–FHA ($70,000–$120,000), and should not have been increased based on the total mortgage proceeds of all the loans charged in the conspiracy count ($1,563,000). The amendment to Application Note 7 of § 2F1.1 became effective November 1, 1991. Defendants were sentenced on May 14, 1992, and the amendment was thus applicable to their sentences as the sentencing court is to apply the guideline in effect at the time of sentencing. *See Stinson v. United States,* — U.S. —, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (U.S. Sentencing Commission's commentary in federal sentencing guidelines is binding authority). Case law subsequent to the adoption of the amendment indicates that the loss calculation of U.S.S.G. § 2F1.1(b) in cases of fraudulently induced bank loans should be based on the "actual" or "expected" loss rather than on the face value of the total amount of the loan

proceeds. *See United States v. Khan,* 969 F.2d 218, 222 (6th Cir.1992) (the Sentencing Code does not provide for an automatic increase based on an estimate of fraud loss when there is an impossibility of any actual loss); *United States v. Baum,* 974 F.2d 496, 498–99 (4th Cir.1992) (in case where defendant plead guilty to making false statement to financial institution to obtain loan, lender's "loss" is to be determined by potential consequences of default, not by total amount of loan proceeds); *United States v. Mount,* 966 F.2d 262, 265 (7th Cir.1992) (The Sentencing Commission's notes defining "loss" in § 2F1.1 calls for the court to determine the net detriment to the victim rather than the gross amount of money that changes hands); *United States v. Rothberg,* 954 F.2d 217, 219 (4th Cir.1992) (defendant, who was convicted of making a false statement on a loan application and obtaining credit from a financial institution by fraudulent means, is to be sentenced based on "a reasonable estimate of the range of the [actual] loss"); *United States v. Smith,* 951 F.2d 1164, 1168–69 (10th Cir.1991) (commentary to Guideline 2F1.1 indicates sentencing court should focus on net loss in regard to defendant convicted of aiding and abetting false statements to a federally insured lending institution, and net loss must reflect value of property securing the loans); *United States v. Kopp,* 951 F.2d 521, 527 n. 9 (3rd Cir.1991) (noting that the court's reasoning anticipates the amendment to U.S.S.G. § 2F1.1).

In the present case, the net result of the district court's action was to comply with the dictates of U.S.S.G. § 2F1.1(b) and the new amendment. Although the district court did not at first apply the amendment to Application Note 7, he anticipated its rationale. After initially increasing each defendant's offense level by twelve based on the face value of the total proceeds of all the mortgage loans charged in the conspiracy count ($1,563,000), the district court then reduced the base offense level by six levels by downward departure based on what he considered

---

**5.** This amendment is contrary to the holdings of the cases relied on by the government (See Brief of Appellee, p. 42), which were decided before

the amendment became effective on November 1, 1991.

to be the estimated actual loss.[6] The district court stated that the actual or expected loss was not over $120,000. The table at § 2F1.1(b)(1)(G) (see footnote 4) indicates that there should be a six-level enhancement based on a loss of $70,000–$120,000. By reducing the initial enhancement of twelve levels by six levels through downward departure, the district court achieved the same result (12 − 6 = 6) as specified by the table at § 2F1.1(b)(1)(G) for a loss of between $70,000–$120,000. Thus the actual result of the district court's overall decision was to increase each defendant's offense level by only six levels, based on a loss determination of between $70,000 and $120,000.

■ Even though under the guideline in effect at the time of sentencing, the district court should have increased each defendant's offense level by six levels based on the "actual" or "estimated" loss to HUD–FHA of $70,-000–$120,000, rather than initially increasing the offense level by twelve based on the total of the mortgage loan proceeds ($1,563,000) and then subtracting six levels based on the actual or expected loss, the district court actually sentenced each defendant based on his estimate that the actual loss was $70,000–$120,000 in compliance with the guideline in effect at the time of sentencing. Because the district court corrected his initial error and reached the correct result, a remand in regard to this issue is not necessary. Under *United States v. Rothberg*, 954 F.2d at 219, the only issue this court must now determine is whether the district court's loss calculation was a reasonable estimate of the actual loss.

■ The district court grappled with the complexity of determining actual loss in the present case. As the district court pointed out, it could be years before the actual loss to HUD–FHA on the fraudulently obtained loans is able to be determined. After a

HUD–FHA loan goes into default, the actual loss cannot be determined until after a claim is paid by HUD–FHA, the property is sold in foreclosure proceedings, and the proceeds of the sale are applied against the claim. Costs which HUD–FHA could incur in retaking a property in a foreclosure proceeding figure directly into the loss and include payments for unpaid interest, taxes, repairs, maintenance, and sales expenses.

The government in the present case introduced statistics indicating that HUD–FHA lost an average $18,032 on the 1,104 houses in the Cleveland area it had acquired through default in 1991. The United States also presented evidence that for any loan that could go into default through foreclosure, payment of a claim by HUD–FHA, and subsequent sale, the average loss to HUD–FHA was $18,558 during 1991, $19,748 in 1990, and $18,690 in 1989.

In the present case, at the time of sentencing, none of the loans had proceeded through the full cycle of default, foreclosure, claim payment, and subsequent sale in which HUD–FHA paid a claim to the mortgage company and then sold the property and applied the sale proceeds against the claims paid, which is what is required by Application Note 7 in order to calculate loss in fraudulent loan application cases. The Nathaniel Brown loan was the farthest along in the process. As of April 10, 1992, HUD–FHA paid a claim of $57,150 on the Brown loan. To date, the government has not been able to sell the property, and no part of the claim paid on the Brown loan has been recouped by the United States. So at the time of sentencing, the United States had lost $57,150 on the Brown loan. In addition, three other loans involved in the conspiracy have gone into default (the Austin, Brooks, and Hubbard loans).[7] The district court concluded that the

---

6. The district court departed downward pursuant to § 5K2.0, which directs the court to consider whether there exists an aggravating or mitigating circumstance of a kind not adequately taken into consideration by the Sentencing Commission.

7. The evidence indicated that the conspiracy involving the operators of Beachwood Realty and loan officers Storey at Cornerstone and defendant Chichy at Centrust involved 26 separate loan applications from February 1988, through

March 1990. Of these loan applications, 16 were processed through Centrust and 10 through Cornerstone. Of the 26 loan applications, five were denied in underwriting at Centrust, and six were denied in underwriting at Cornerstone. Thus, of the 26 applications, 11 were denied in underwriting at the mortgage companies after they had been approved by defendant Chichy or co-conspirator Storey for various reasons such as poor credit, prior bankruptcies, inability to document

actual loss to the government could be estimated to be between $70,000–$120,000 and ultimately adjusted both defendant Chichy's and Galloway's base offense levels based on that amount. If the average 1991 loss figure for loans in default for houses in the Cleveland area ($18,032) is multiplied by four (the number of loans in default), it is clear that the district court's estimate has a reasonable basis, especially in light of the fact that a further estimate of additional loss would be in the court's discretion for the likelihood that the loans which are presently current may go into default in the foreseeable future. Alternatively, it can be argued that if the court had taken the entire claim paid in the Brown loan of $57,150, used an average estimated expected loss for the other loans in default (Austin, Brooks, and Hubbard), and a reasonable estimate of expected loss for other current loans fraudulently obtained, the estimated loss would well exceed $120,000.

Defendants' contention that the actual loss should be determined to be 0 has no merit. Application Note 8 to U.S.S.G. § 2F1.1 states:

> For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations.

Moreover, Application Note 10 to § 2F1.1 provides that the dollar loss often "does not fully capture the harmfulness and seriousness of the conduct." In the present case, the current dollar loss of $57,150 on the Brown loan (even though it may not be the final dollar loss on that loan) does not fully capture the harmfulness of the conduct in which over twenty-six loan applications were

made using fraudulent information. In a case such as this when it may be years before the final actual loss to HUD–FHA is known, it was reasonable for the district court to use the method described for calculating an estimated loss (multiplying the average loss figure by the number of loans currently in default).

■ It was proper to assess the amount of loss for the loans in default against both defendants Galloway and Chichy, whether or not he or she was charged in regard to that loan in a substantive count, because under U.S.S.G. § 1B1.3(a)(2), all acts that were part of the same course of conduct or common scheme or plan as the offense of conviction for which the defendant would be otherwise accountable are to be considered relevant conduct for sentencing purposes. Application Note 1 to § 1B1.3 states that "[i]n the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." In the present case, the fraudulent loan applications of all the loans charged in the substantive counts were made in furtherance of the execution of a jointly-undertaken criminal activity that was reasonably foreseeable to defendants Galloway and Chichy. Contrary to defendant Galloway's contention, the district court did not include in the "estimated" loss calculation the proceeds from the fraudulent loans where no actual loss was possible because the loans were subsequently disqualified by the underwriting department. Because the loans which had been denied in underwriting were not used to calculate the estimated actual loss of $70,000–$120,000, the prohibition of this court's decision in *United States v. Khan*, 969 F.2d 218 (6th Cir.1992) does not apply.[8]

---

a down payment, or inability to verify employment.

**8.** This court in *Khan* held that when no dollar loss is possible for reasons entirely unrelated to the fraud or its discovery, the court does not

have available to it increases in sentencing based on fraud loss. In *Khan*, a fraudulent social security claim was denied because the applicant had not worked a sufficient number of quarters to obtain benefits. Thus, no actual loss was possible.

To conclude, because the actual result of the district court's decision was to increase the defendants' offense levels based on the "actual" or "estimated" loss of $70,000–$120,000, and the initial error of basing the loss on the face value of the total amount of the mortgage loan proceeds ($1,563,000) was harmless, the district court is affirmed on this issue.

### V.

To conclude, the district court is AFFIRMED in part and REVERSED in part. The district court's denial of defendants' motions for acquittal due to insufficient evidence is AFFIRMED. The district court's enhancement of each defendant's base offense level by six levels based on an estimated actual loss of $70,000–$120,000 is AFFIRMED. The district court's two level enhancement under § 2F1.1(b)(2) in addition to a two level enhancement under § 3B1.1(c) is prohibited by this court's decision in *Romano*. Therefore, the district court is REVERSED in regard to this issue and the case is REMANDED for proceedings consistent with this opinion.