UNITED STATES of America,
Plaintiff–Appellee,

v.

James F. MOORED, Defendant–
Appellant.

No. 93–2230.

United States Court of Appeals,
Sixth Circuit.

Argued May 2, 1994.

Decided Nov. 1, 1994.

Julie Ann Woods, Asst. U.S. Atty. (argued and briefed), Grand Rapids, MI, for plaintiff-appellee.

David A. Dodge (argued and briefed), Grand Rapids, MI, for defendant-appellant.

Before: JONES and BATCHELDER, Circuit Judges; and GILMORE, District Judge.[*]

GILMORE, District Judge.

This is the second time this case has been before this court. Appellant James Moored was charged in a one count information with wire fraud, and entered into a plea agreement with the government wherein the parties agreed to a specific account of the events and a nonbinding calculation of the dollar amount that should attach to the offense. He was sentenced to 27 months imprisonment, three years supervised release, and a $50.00 mandatory special assessment. Moored appealed this sentence.

On appeal, this court reversed Moored's 27 month sentence, and remanded the case for resentencing. *United States v. Moored,* 997 F.2d 139 (6th Cir.1993). At resentencing, Moored again received a sentence of 27 months incarceration, and this appeal followed.

The facts of the case were adequately set forth in the first appeal as follows.

In early 1990, Defendant applied for loans in the total amount of $1,750,332 from various private lenders. Defendant indicated to the lenders that $400,000 of the loan proceeds would be used to pay a debt owed to Jordan College, a small institution in Grand Rapids, Michigan. Defendant had an active history with the college, including a term on its board of trustees. He had engaged in various financial transactions with the college, including loans, donations, and real property transactions, based in part on promises that he failed to keep and representations that proved untrue.

The debt to Jordan College was comprised of a $100,000 loan that the college made to Defendant, a $50,000 undisclosed lien on property that Defendant sold to the college, and a $175,000 downpayment on that same property that Appellant had promised to return to the college.

In order to entice the lenders, Defendant falsified an offer to purchase stock that Defendant had pledged as security for the loan. Defendant transmitted the falsified offer from outside the state of Michigan by facsimile to the lenders' counsel in Michigan. Defendant also falsified a letter of credit from Northwest Bank.

Immediately after the two checks comprising the loan were transferred to Defendant, the lenders learned of the fraud and stopped payment. The lenders suffered no actual loss.

Defendant pled guilty to a one-count information pursuant to a plea agreement. The government agreed that the potential loss to the lenders was less than $350,000, which would result in an offense level enhancement of eight levels, according to 2F1.1(b)(1)(I) of the United States Sentencing Guidelines ("U.S.S.G."). The basis for that calculation was the actual value of the stock pledged as security compared to the value fraudulently attributed to the stock by Defendant when applying for the loans.

The probation officer agreed that the base offense level was six, pursuant to U.S.S.G. § 2F1.1. In addition, the officer recommended an enhancement of twelve levels, pursuant to U.S.S.G. § 2F1.1(b)(1)(M), finding the potential or intended loss to be $1,500,000 to $2,000,000. That calculation was purportedly based on the amount of the loans added to the amount owed to Jordan College.

At sentencing, the district court found the amount of the loss to be $325,000, which represented only Defendant's debt to Jordan College.... On that basis, the court enhanced the offense level by eight.

*Moored,* 997 F.2d at 140–41. (footnote omitted).

The Court vacated Moored's 27 month sentence and remanded the case for resentencing. First, the court found that the district court committed "clear error" by including the potential loss to Jordan College in the computation of the total loss. Additionally,

* The Honorable Horace W. Gilmore, United States District Judge for the Eastern District of Michigan, sitting by designation.

the court held that the district court incorrectly added two levels for abuse of a position of trust. Finally, the court concluded that the district court must reconsider the acceptance of responsibility issue, excluding from consideration Defendant's conduct in connection with Jordan College.

At Moored's original sentencing, the district court determined that both the actual and intended loss for sentencing purposes was zero. This determination was not appealed by either Moored or the government. However, upon resentencing, the district court reviewed its earlier determination and recalculated the loss to equal the gross amount of the loans. The issue on appeal is whether the district court had the authority to do so.

At the resentencing, the district court stated that it had earlier made a mistake regarding the calculation of the loss, and the intended loss was properly determined at $1,700,000, rather than zero. Based on this loss calculation, the court reimposed the same sentence of 27 months imprisonment. The court determined that this was a proper sentence under the United States Sentencing Guidelines based upon a finding of a potential loss or an intended loss of 1.7 million dollars.

## I.

The first question we must resolve is whether the district court was authorized to reconsider the loss attributable to Defendant on remand.

Defendant contends the district court was precluded from reconsidering the loss issue for two reasons: (1) this court's mandate did not direct the district court to reconsider the loss issue, and (2) neither party challenged the district court's findings and conclusions on that issue in the first appeal and, therefore, the district court's determination of zero loss became the law of the case. Accordingly, Defendant argues that the district court's decision to reconsider and reverse its earlier ruling concerning the loss issue violated the "law of the case" doctrine and the "mandate rule."

Under the doctrine of law of the case, findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation. *United States v. Bell,* 988 F.2d 247, 250 (1st Cir.1993). A complementary theory, the mandate rule, requires lower courts to adhere to the commands of a superior court. *Id.* at 251. Accordingly,

> [u]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must 'proceed in accordance with the mandate and the law of the case as established on appeal.' The trial court must 'implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.'

*United States v. Kikumura,* 947 F.2d 72, 76 (3d Cir.1991). (Citations omitted).

In determining whether the district court violated the law of the case doctrine or the mandate rule, we must consider: a) whether the loss issue was expressly or impliedly decided by this court in Defendant's first appeal, and b) whether this court's mandate to the district court was so narrow in scope as to preclude the district court from considering the loss issue.

The law of the case doctrine and the mandate rule generally preclude a lower court from reconsidering an issue expressly or impliedly decided by a superior court. However, these principles are not without exception. "Even where, as here, an appellate court's mandate does not contemplate resurrecting an issue on remand, the trial court may still possess some limited discretion to reopen the issue in very special situations." *Bell,* 988 F.2d at 250–51. In *Petition of United States Steel Corp.,* 479 F.2d 489, 494 (6th Cir.), *cert. denied,* 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973), this circuit explained that the law of the case doctrine dictates that issues, once decided, should be reopened only in limited circumstances, e.g., where there is "substantially different evidence raised on subsequent trial; a subsequent contrary view of the law by the controlling authority; or a clearly erroneous decision which would work a manifest injustice." (*citing White v. Murtha,* 377 F.2d 428, 431–432 (5th Cir.1967)). *Accord United States v. Rivera–Martinez,* 931 F.2d 148 (1st

Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991).

In addition to those exceptions outlined by the Sixth Circuit in *Petition of United States Steel Corp.,* several circuits have given broad discretion to the district court to reconsider sentencing factors on a sentencing remand. For example, in *United States v. Smith,* 930 F.2d 1450, 1456 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 225, 116 L.Ed.2d 182 (1991), the court stated that absent explicit limitations in the appellate court's mandate, an order vacating a sentence and remanding the case for resentencing "directs the sentencing court to begin anew, so that 'fully *de novo* resentencing' is entirely appropriate.... The law of the case doctrine and the cases cited by Mr. Smith are inapposite, given this court's vacation of his initial sentence." *See also United States v. Cornelius,* 968 F.2d 703, 705 (8th Cir.1992) ("Once a sentence has been vacated or a finding related to sentencing has been reversed and the case has been remanded for resentencing, the district court can hear any relevant evidence on that issue that it could have heard at the first hearing."); *United States v. Sanchez Solis,* 882 F.2d 693, 699 (2d Cir.1989) ("[I]n the interests of truth and fair sentencing a court should be able on a sentence remand to take new matter[s] into account on behalf of either the Government or the defendant."); *United States v. Romano,* 749 F.Supp. 53, 55 (D.Conn.1990) (on remand, a sentencing court may proceed as it might have proceeded in the first instance), *aff'd sub nom., United States v. Lanese,* 937 F.2d 54 (2d Cir.1991).

The only portion of the first *Moored* decision, 997 F.2d 139, that specifically discussed the district court's loss calculation related to the appropriateness of including the debt to the college because it could not be viewed as relevant conduct. In addressing that narrow issue, we stated:

> Defendant argues that his transactions with Jordan College are not relevant conduct. *The importance of the district court's inclusion of those activities in the calculation of the loss in this case lies in the fact that the district court found that no actual loss resulted from the offense of*

*conviction.* The court based the eight level enhancement for the amount of the loss solely on Defendant's transactions with Jordan College. That enhancement had the effect of raising Defendant's final sentencing range from six to twelve months to 27 to 33 months.

*Moored,* 997 F.2d at 143. (emphasis added).

■ With respect to the above-mentioned section of the *Moored* opinion, we concluded that "the district court committed clear error by including the amount of the 'loss' to Jordan College in the computation of Defendant's total offense level." *Id.* at 144. This court did not, however, make a determination of whether any loss, i.e., actual or intended, resulted from the offense of conviction. We find that the mere repetition of the factual findings of the district court cannot be deemed a decision of the appellate court. In other words, the first *Moored* panel did not consider or resolve the issue of whether the district court's conclusion concerning the amount of loss was in accordance with the law. In our view, therefore, this court did not expressly or impliedly decide the "loss" issue or even affirm the district court's finding that no loss resulted from the offense of conviction. As such, we conclude that the district court did not violate the law of the case doctrine in deciding to reconsider and reverse its earlier ruling concerning the loss issue.

■ Moreover, we conclude that the district court did not violate the mandate rule. The mandate to the district court stated: "For the foregoing reasons, the judgment of the district court is vacated, and this case is remanded for resentencing according to law and consistent with this opinion." *Moored,* 997 F.2d at 144. Because, as we have explained, this court did not address the "loss" issue, the district court's decision to revisit that issue is not inconsistent with our earlier ruling. Thus, the mandate rule did not prohibit the district court from reconsidering the loss issue and reversing its earlier decision regarding same. Based on the foregoing, we hold that the district court did not err in deciding to revisit the loss issue on remand.

In the instant case, the district judge believed that he had made a mistake regarding his earlier calculation of loss for the offense of conviction. Where, as here, the district court felt constrained to reconsider the loss issue to resentence Defendant in accordance with the law, we feel that this court's interest in truth, justice and fair sentencing, requires that the district court's decision to reopen the loss issue be upheld. Accordingly, we hold that the district court did not violate either the law of the case doctrine or the mandate rule and, therefore, the district judge did not exceed the scope of his authority on remand by reconsidering the loss issue.

## II.

Having determined that the district court did not err in revisiting the loss issue on remand, the next question before the court is whether the district court erred in calculating Moored's offense level based on "loss" of $1.7 million. Moored argues that the base offense level should have been six (6) because there was no actual or intended loss to the lenders. This court reviews the application of the United States Sentencing Guidelines *de novo*. *United States v. Hicks*, 4 F.3d 1358, 1361 (6th Cir.1993); *United States v. Sanchez*, 928 F.2d 1450, 1458 (6th Cir.1991). We must uphold a sentencing court's factual findings unless they are clearly erroneous. *United States v. Watkins*, 994 F.2d 1192, 1195 (6th Cir.1993).

After this case was remanded to the district court, the probation officer submitted a revised presentence report. At paragraph 35, the Report recommended that Defendant receive a twelve (12) level increase in his base offense level for the loss involved, stating:

> Specific Offense Characteristics: Section 2F1.1(b)(1)(M) provides a 12 level increase because the fraud involved more than $1,500,000.00. The instant offense involved a potential loss of over $1,750,000.00.

J.A. at 22.

At the resentencing proceeding, the district judge reconsidered and reversed his earlier decision that Defendant's sentence would not be enhanced for actual or intended loss for the offense of conviction. Over Defendant's objections, the district court found that "that 12–level increase is not unreasonable in light of the fact that the fraud picture was more than $1,700,000." J.A. at 200. The district court began by stating, "[t]his court erroneously sought to benefit Mr. Moored with the benefit of looking at what an actual loss was, and this Court perhaps incorrectly did so." J.A. at 198. The district court explained that it "ha[d] gone back to review 2F1.1" and it understood the "question is the intended loss or probable loss that was anticipated to be undertaken as a result of the immediate transactions and relevant conduct of Mr. Moored, and clearly I think here amounts to more than $1,700,000." J.A. at 198–199. The district court then concluded that Defendant's intended loss was more than $1,700,000. J.A. at 199.

The applicable guideline provision for offenses involving fraud and deceit is Guideline § 2F1.1, and the accompanying commentary. Section 2F1.1 assigns a base offense level of six, then "the Guidelines award bonus punishment points for different levels of proven loss beginning with $2,000." *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir.1991). *See* U.S.S.G. § 2F1.1(b)(1)(A)–(S) (providing for an increase of one level for a dollar loss of more than $2,000 and up to an increase of eighteen levels for a loss of more than $80,000,000).

Application Note 7 to § 2F1.1 instructs how the loss is to be measured, stating as follows:

> 7. Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). As in theft cases, loss is the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred. Consistent with the provisions of § 2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. Frequently, loss in a fraud case will be the same as in a theft case.

For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000.

U.S.S.G. § 2F1.1, comment. (n.7). This general rule is subject to modification in certain exceptional circumstances "where additional factors are to be considered in determining the loss or intended loss." *Id.*

Fraudulent loan application cases, as is involved in the instant case, is an example of such an exceptional circumstance. Subsection (b) of Application Note 7 deals with fraudulent loan applications stating:

> In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.
>
> In some cases, the loss determined above may significantly understate or overstate the seriousness of the defendant's conduct. For example, where the defendant substantially understated his debts to obtain a loan, which he nevertheless repaid, the loss determined above (zero loss) will tend not to reflect adequately the risk of loss created by the defendant's conduct. Conversely, a defendant may understate his debts to a limited degree to obtain a loan (*e.g.*, to expand a grain export business), which he genuinely expected to repay and for which he would have qualified at a higher interest rate had he made truthful disclosure, but he is unable to repay the loan because of some unforeseen event (*e.g.*, an embargo imposed on grain exports) which would have caused a default in any event.
>
> In such a case, the loss determined above may overstate the seriousness of the defendant's conduct.

U.S.S.G. § 2F1.1, comment. (n. 7(b)). Thus, under Comment Note 7(b), in fraudulent loan application cases the loss is either "the actual loss to the victim," or "where the intended loss is greater than the actual loss, the intended loss is to be used." Additionally, Application Note 8 instructs that the loss calculated under § 2F1.1(b)(1) need not be determined with precision; rather, the court need only make a reasonable estimate of the loss, given the available information. U.S.S.G. § 2F1.1, comment. (n. 8). Finally, Application Note 10 allows an upward or downward departure from the sentencing range where the loss calculation either understates or overstates the seriousness of the offense. U.S.S.G. § 2F1.1, comment. (n. 10).

The circuits appear to be split on how to define fraud loss. One of the earliest cases which addressed the meaning of "loss" under the Guidelines was *United States v. Schneider, supra*. In *Schneider*, defendants were convicted of conspiring to defraud and defrauding federal agencies in connection with misrepresentations made during a contract bidding process. The Schneiders, husband and wife, submitted bids for contract work for two federal agencies. In one bid, Mr. Schneider certified falsely that he had not been charged with a criminal offense within the past three years, when in fact a charge of forgery was then pending against him in an Illinois state court. Mr. Schneider also submitted a fraudulent payment and performance bond. Being the low bidder, he won the contract. However, before the performance began or any payment was made under the contract, the federal agency cancelled it on the ground of misrepresentation and awarded the contract to a higher bidder. In a second bid, Mrs. Schneider submitted the same type of fraudulent payment and performance bond. Mrs. Schneider did not, however, receive the bid as the agency was dissatisfied with the bond (though it did not realize at that time that the bond was fraudulent). The government claimed that the "loss" for sentencing purposes was the face value of the contracts, or $142,400.

The *Schneider* court stated that "'loss' within the meaning of the Guidelines includes intended, probable, or otherwise expected loss, a qualification of vital importance in a

case such as this where the fraud is discovered or otherwise interrupted before the victim has been fleeced." *Schneider*, 930 F.2d at 558. Finding that Mr. Schneider had previously performed some fifty contracts for federal agencies, and that there was "no reason to believe that he and his wife would not have performed these two contracts to the equal satisfaction of the contracting agencies," the court felt it necessary to distinguish between two types of fraud for sentencing purposes. *Id.* at 558. The court explained:

> But it is necessary to distinguish between two types of fraud. One is where the offender—a true con artist (as in *Davis* [922 F.2d 1385 (9th Cir.1991)] )—does not intend to perform his undertaking, the contract or whatever; he means to pocket the entire contract price without rendering any service in return. In such a case the contract price is a reasonable estimate of what we are calling the expected loss, and we repeat that no more than a reasonable estimate is required. The other type of fraud is committed in order to obtain a contract that the defendant might otherwise not obtain, but he means to perform the contract (and is able to do so) and to pocket, as the profit from the fraud, only the difference between the contract price and his costs. This is such a case.

*Schneider*, 930 F.2d at 558. (citations omitted).

The *Schneider* court rejected as "irrational" a holding that would apply as severe a sentence to a performing contractor who submitted false documents with his application as to a true con artist who does not intend to perform his undertaking. *Id.* at 559. Finally, the court concluded that the government did not prove any loss, actual or intended, to the victims. Thus, the appellate court held that "[t]he government did not earn a bonus in this case," and remanded the case with explicit instructions that the district court resentence defendants "without an additional punishment based on a proven monetary loss—for none was proved." *Id.*

The Tenth Circuit employed a similar analysis in *United States v. Smith*, 951 F.2d 1164 (10th Cir.1991), where the defendant was convicted of aiding and abetting false statements to a federally insured lending institution. On the basis of certain misrepresentations, the defendant was advanced loans in the cumulative amount of $440,896. Nonetheless, at the time of sentencing it was observed that not a single loan was in default. In determining the proper sentence, the district court accepted the probation officer's offense level calculation and added a nine level enhancement for a loss value of $440,896, the total face value of the loans. Apparently, the district judge concluded that there was no actual loss, but that defendant intended to inflict a loss of $440,896.

The *Smith* court began by acknowledging that the district court had authority under the guidelines to increase defendant's base offense level for either actual or intended loss, whichever is greater. *Smith*, 951 F.2d at 1166. "Where there is no [actual] loss, or where actual loss is less than the loss the defendant intended to inflict, intended or probable loss may be considered." *Id.* The court cautioned, however, that in order to increase a defendant's offense level for intended loss, "the record must support by a preponderance of the evidence the conclusion that Mr. Smith realistically intended a $440,896 loss, or that a loss in that amount was probable." *Id.* at 1168. The court ultimately concluded that the government failed to offer any support for its assertion that defendant intended to cause loss in the amount of $440,896, stating:

> On appeal, the government never argues that Smith *intended* to cause loss in the full amount of the loans, only that 'the potential that these six loans may eventually go into default is ever present.' Brief of Plaintiff–Appellee at 5. However, as Mr. Smith points out, each of the six loans was secured by the house on which the loan was made, and the home buyers have been paying down their loans. Thus, even under a worst case scenario, the total potential loss could not be the full amount of the loans. We do not believe the possibility that some loss might occur on one or more of the six loans in the future amounts to the 'probable' loss contemplated by section 2F1.1. The government has simply

failed to offer any support for its calculation.

*Smith,* 951 F.2d at 1169. (emphasis in original). Finding no actual loss, and no support in the record for the district court's determination that defendant intended to inflict a loss in the full amount of the loans, the Tenth Circuit held that "the court may only properly sentence on the basis of the base offense level of six provided by section 2F1.1(a)." *Id.* at 1169. *See also United States v. Hughes,* 775 F.Supp. 348, 350–351 (E.D. Cal. 1991) (although the defendant conspired to present false loan applications to buy three homes, the court rejected the government's argument that the total amount of the loans should be considered as "loss" upon its finding that "defendant did not intend for the banks to suffer any economic loss as a result of the loans"). *But see United States v. Johnson,* 908 F.2d 396, 398 (8th Cir.1990) (court declined to reduce the loss calculation by the amount recovered by the defrauded bank where defendant was a true con artist who falsified identification to obtain loans for herself).

In *United States v. Shaw,* 3 F.3d 311 (9th Cir.1993), the Ninth Circuit had occasion to consider the question of how to define "loss" when the defendant intends to pay back a fraudulently obtained loan. The *Shaw* court held that " 'intended loss' is the amount the defendant subjectively intended not to repay. Under the 1989 Guidelines, it is this figure, rather than the total at risk from the bank's perspective, which is to be compared with the amount actually lost by the victim, for purposes of sentencing." *Id.* at 312. Recognizing a difference of opinion among the circuits on how to define "intended loss," the *Shaw* court agreed with other courts which have defined intended loss as "the loss the defendant intended to inflict on the victim." *Id.* at 313. (*citing United States v. Kopp,* 951 F.2d 521, 531 (3d Cir.1991)). Thereby, the *Shaw* court rejected the rationale of the Second Circuit in *United States v. Brach,* 942 F.2d 141 (2d Cir.1991), which held that " 'loss' was the amount taken, or put another way, that 'intended' and 'probable' loss equate with the gross amount of a fraudulently obtained loan." *Id. See also Hughes,* 775 F.Supp. at 350 (" 'Intended' must be interpreted as re-

lating to the state of mind of the defendant at the time of the offense.")

In *Kopp, supra,* the defendant, a real estate developer, pled guilty to procuring a bank loan by fraudulent misrepresentations, in violation of 18 U.S.C. § 1344. The district court agreed with the government that the amount of loss, for the purposes of § 2F1.1, was the full $13.75 million face value of the loan. Thereby, the court declined to accept the probation officer's calculation that the bank's actual loss was only $3.4 million in light of the fact that the bank was able to sale the security for the loan for more than the loan balance.

In *Kopp,* the Third Circuit found the logic in *Schneider* and *Hughes* compelling and held that "fraud 'loss' is, in the first instance, the amount of money the victim has actually lost (estimated at the time of sentencing), not the potential loss as measured at the time of the crime. However, the 'loss' should be revised upward to the loss that the defendant intended to inflict, if that amount is higher than actual loss." *Kopp,* 951 F.2d at 535–536. Accordingly, the court concluded that the district court erred in determining that a loss under § 2F1.1 is always the amount fraudulently obtained, regardless of actual or intended loss. *Id.* at 536.

The Sixth Circuit recently dealt with a similar issue in *United States v. Chichy,* 1 F.3d 1501 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 620, 126 L.Ed.2d 584 (1993). In *Chichy,* the defendants were convicted of conspiracy and making false, fictitious, or fraudulent statements to federal agents in connection with applications for Federal Housing Administration loans. At the sentencing hearing, the government argued that the intended loss was the total face value of the mortgage loans charged in the conspiracy count, which amounted to $1,563,000. The district court estimated that the actual loss would not be more than $120,000. Nonetheless, the district court accepted the government's calculation of loss and enhanced defendants' sentence by 12 levels based on the face value of all the loans.

Relying on Application Note 7(b) to § 2F1.1, the *Chichy* court explained that "the

loss calculation of U.S.S.G. § 2F1.1(b) in cases of fraudulently induced bank loans should be based on the 'actual' or 'expected' loss rather than on the face value of the total amount of the loan proceeds." *Chichy*, 1 F.3d at 1508. The court then cited several cases in further support of this interpretation. *See, e.g., United States v. Mount*, 966 F.2d 262, 265 (7th Cir.1992) (The Sentencing Commission's notes defining "loss" in § 2F1.1 calls for the court to determine the net detriment to the victim rather than the gross amount of money that changes hands).

The *Chichy* court held that the offense levels "should not have been increased based on the total mortgage proceeds of all the loans charged in the conspiracy count ($1,563,000)," but rather, "the district court should have increased each defendant's offense level by six levels based on the 'actual' or 'estimated' loss to HUD–FHA of $70,000–$120,000." *Id.* at 1508–09. Ultimately, the *Chichy* court found that the district court committed only harmless error where the district court initially increased the offense level by twelve based on the total of the mortgage loan proceeds, then subtracted six levels based on actual or expected loss. Because the district judge corrected his initial error and reached the correct result, the district court was affirmed on this issue. *Id.* at 1509.

This circuit likewise held that the face value of a loan fraudulently obtained was not the proper measure of the loss under § 2F1.1 in *United States v. Buckner*, 9 F.3d 452 (6th Cir.1993). There, the court remanded the case for resentencing where the district court enhanced the offense level by eight levels based on the total value of the loans advanced to the defendant, a cumulative amount of $200,000. Over her objections, the district court refused to consider defendant's assertion that she had repaid approximately $127,000 on the loans and, therefore, such amount should be subtracted from the losses of the financial institutions. Citing *Chichy*, the *Buckner* court remanded the case for resentencing upon its finding that the district court erred in refusing to consider the amount of any repayment made by defendant

prior to the discovery of the fraud. *Buckner*, 9 F.3d at 454.

*Chichy* and *Buckner* are both distinguishable from the instant case in that the defendants caused actual loss to the victims. Applying Application Note 7 to the facts therein, the *Chichy* and *Buckner* courts held that the calculation of "loss" for the purposes of U.S.S.G. § 2F1.1, in cases of fraudulently induced bank loans, should be based on the "actual" or "expected" loss to the victims and not the face value of the fraudulently obtained loans.

█ We hereby part company with those circuits that have held that "intended loss" for the purposes of U.S.S.G. § 2F1.1 should be equated with the gross amount of a fraudulently obtained loan. Rather, we find most persuasive and, therefore, join the ranks of those circuits which have defined intended loss as the loss the defendant subjectively intended to inflict on the victim, e.g., the amount the defendant intended not to repay. Under this view, "loss" under § 2F1.1 is not the potential loss, but is the actual loss to the victim, or the intended loss to the victim, whichever is greater.

█ In this case, Defendant provided false information to a group of private lenders in an effort to obtain a $1,750,332 loan. The false information related to the collateral which would be pledged to secure the loan. Two checks in the amount of $868,239 were issued to Defendant to partially fund the loan. Apparently, the lenders discovered the false statements after the checks were issued, but they were able to stop payment on the checks before they were cashed by Defendant. Thus, the lenders were able to recover all of their money.

We must begin with the fact there is no evidence of any actual loss in the record. Nonetheless, the district court found "a potential loss or an intended loss of $1.7 million." J.A. at 199. As the Third Circuit stated in *Kopp*, "[t]he fraud guideline [ ] has never endorsed sentencing based on the worst-case scenario *potential* loss (here, the face value of the loan)." *Kopp*, 951 F.2d at 529. (emphasis in original). Therefore, under the reasoning of *Kopp*, and *Smith, supra*, the record must support, by a preponderance of

the evidence, a conclusion that Defendant realistically intended a loss of more than $1,700,000.

In finding an intended loss of $1.7 million, the district judge stated:

> Now, this question of intention of repayment, the world is paved with good intentions. I don't think I've ever had anyone before me on a wire fraud or embezzlement charge who didn't indicate they intended to repay. I take that back; I may have had one or two. But everybody wants to repay. The question is: Is there a reasonable probability in some cases, were efforts made, et cetera, et cetera. I find due to the magnitude of the potential intended loss here and due to Mr. Moored's precarious financial circumstances, and due to the nature of the fraudulent nature of the pledge he made here, I find that his ability certainly, if that was his intention, was certainly far removed from that intention. And therefore, I find that a potential loss or an intended loss of $1.7 million does not do an injustice to the particular picture that is before this Court as it pertains to at least Windquest and Prime Bank here that are the two subject matters that brought us here. The question of what was the actual loss I don't think is a true measurement, then, of the magnitude of what application note 7 directs this Court to consider.

J.A. at 199.

Relying primarily on *Shaw*, *Schneider*, and *Kopp*, Defendant argues that the district court erred in determining the enhancement for the amount of loss under U.S.S.G. § 2F1.1. Defendant asserts that the district court properly determined at the original sentencing proceeding that the amount of actual loss for the offense of conviction was zero and that Defendant did not intend to cause any financial loss. Therefore, according to Defendant, the base offense level for his offense of conviction is six, and it should not have been increased based on actual or intended loss.

The government responds that neither *Chichy* nor *Buckner* deals with the circumstances of the instant case and are therefore not controlling of this issue. We agree with the government's contention that *Chichy* and *Buckner* do not directly deal with the circumstances of this case. While neither of those cases dealt with the calculation of loss when there is no actual loss involved, we believe the Seventh Circuit and the Tenth Circuit provided compelling logic on how to resolve this issue in *Schneider* and *Smith*. Notably, the government did not address either of these cases in its brief to this court.

The government further asserts that at the first sentencing hearing it provided the district court with an affidavit indicating that the collateral in question was already pledged by Defendant to another creditor and did not have the value claimed by Defendant, nor could it have been readily used by the victims to offset their loss. Accordingly, the government maintains that the total loan package of $1,750,332, was properly found to be the amount of loss for the offense of conviction.

There is nothing in either the amended presentence report or the transcript of the resentencing proceeding which indicates that the district court had any factual basis for finding that Defendant intended a loss of $1.7 million. As stated above, there was a question raised about whether the collateral pledged was sufficient and/or available to secure the loan, but there is no evidence in the record even to suggest that the victims would have been forced to rely on the collateral because Defendant intended from the outset to default on his obligation to repay the loan.

Additionally, there is no evidence in the record to support a finding that Defendant had no financial ability to repay the loan. The only person, other than the district judge, who ever said anything positive or negative about Defendant's intentions respecting the loan was Defendant himself. At the original sentencing proceeding, Defendant was allowed to make a statement on his own behalf and he asserted that he had every intention to repay his debt. Specifically, Defendant stated:

> There was never an intent to defraud. There was a purpose there, and granted, it was survival.... It's a lot of money, you know, the total package, but there was in the plan ways to pay it off.

.　　.　　.　　.　　.

I reached a point in my mind mentally where I wanted [the loan] to come about so badly and I still felt there was an opportunity to not hurt anybody and not have there be any losses or any pain that was being suffered by the people that were involved at that time that I really believed I could do it. I thought I could pull it off. It wasn't something I was going to grab a bunch of money and take off. That was the farthest thing from my mind. I never have walked away from any responsibilities or obligations in my life, and I crossed over that line somewhere in April, in March and April, and I'm sorry.

J.A. at 182–83.

The government did not introduce any evidence, either at the original or resentencing hearing, to refute Defendant's assertions that he intended to perform his obligations. Moreover, the government declined to argue that Defendant intended to cause a loss in the full amount of the loan. Even in its brief to this court, the government does not argue that Defendant intended a loss in the amount of $1.7 million. Rather, the government simply repeats with approval the district judge's comment that all defendants charged with fraud or embezzlement indicate that they intended to pay the money back, and this Defendant was no exception. Government's Brief at 11.

The district judge commented upon Moored's "precarious financial circumstances" and indicated that Moored had no financial ability to repay the loan, but failed to state in the record how he came to this conclusion. Due to the lack of support in the record for the district court's findings, we conclude that the district judge enhanced Defendant's offense level by twelve levels for intended loss of $1.7 million based solely on his speculation that Defendant did not intend to repay the loan. Clearly, it would have been proper for the district court to enhance Defendant's offense level if there was sufficient evidence in the record that Defendant did not intend to repay the loan, or even if there was proof in the record that Defendant had no realistic means to repay the loan. However, such a conclusion cannot be supported by the record of this case.

For the reasons stated, we conclude that the district court was clearly erroneous in finding that Defendant intended a loss to his victims in the amount of $1.7 million. As mentioned earlier, U.S.S.G. § 2F1.1 provides a base offense level of six for all fraud and deceit cases, even where minimal loss is involved. Because there is no evidence in the record to support any actual or intended loss to Defendant's victims, we find that the district court erred in enhancing the base offense level by twelve levels.

### III.

For the reasons given, the Defendant's sentence is VACATED and this case is REMANDED to the district court for resentencing consistent with this opinion. The district court erred in enhancing the base level offense by 12 levels. Defendant's offense of conviction carries a base offense level of 6, a loss calculation of 0, and a criminal history category of I, with a resulting sentencing range of 0 to 6 months. The case is remanded, with instructions that Defendant be sentenced to time served because he has already served slightly more than six months under the proper guideline range for a base level of six. VACATED AND REMANDED.