**SAULT STE. MARIE TRIBE OF CHIP-PEWA INDIANS; Grand Traverse Band of Ottawa and Chippewa Indians; Keweenaw Bay Indian Community; Hannahville Indian Community; Bay Mills Indian Community; and Lac View Desert Band of Lake Superior Chippewa Indians, Plaintiffs,**

**and**

**Saginaw Chippewa Indian Tribe of Michigan, Intervening Plaintiff,**

**v.**

**John M. ENGLER, Governor of the State of Michigan, Defendant.**

**No. 1:90–cv–611.**

United States District Court, W.D. Michigan, Southern Division.

Feb. 28, 2000.

Bruce Richard Greene, Greene, Meyer & McElroy, PC, Boulder, CO, Daniel T. Green, Sault Ste Marie Tribe of Chippewa Indians, Sault Ste Marie, MI, for Sault Ste. Marie Tribe if Chippewa Indians.

William Rastetter, Cedar, MI, John F. Petoskey, Suttons Bay, MI, for Grand Traverse Band of Ottawa and Chippewa Indians.

Joseph P. O'Leary, Baraga, MI, Dawn S. Duncan, Wilson, MI, John M. Peebles, Monteau, Peebles & Marks, LLP, Omaha, NE, for Hannahville Indian Community.

Anthony E. Andary, Andary & Andary, PC, Sault Ste. Marie, MI, Kathryn L. Tierney, Brimley, MI, for Bay Mills Indian Community.

John M. Peebles, Monteau, Peebles & Marks, LLP, Omaha, NE, Edward R. Freeberg, Watersmeet, MI, for Lac Vieux Desert Band of Lake Superior Chippewa Indians.

Francis Robert Jozwiak, Morisset, Schlosser, Ayer & Jozwiak, Seattle, WA, Michael G. Phelan, Morisset, Schlosser, Ayer & Jozwiak, Mt. Pleasant, for Saginaw Chippewa Indian Tribe of Michigan.

Keith D. Roberts, Nelson W. Westrin, Asst. Atty. General, Jennifer M. Granholm, Attorney General, Lottery & Racing Divi-

sion, Lansing, MI, for State of Michigan, John M. Engler.

John F. Kelly, Groose Points Woods, MI, for Rose Ann Roarty–Collins, Grace Boggs, Robert Tose, Eddie Cobbin, Obie Mathews, David Richie, Trish Arnt, Laugrita Tucker, Erin Barthel, Alan Rice, III.

Bill McMaster, Birmingham, MI, pro se.

## OPINION

HILLMAN, Senior District Judge.

This action was filed by plaintiff Indian tribes[1] in 1990 and originally was assigned to Hon. Benjamin F. Gibson. The complaint alleged that defendant State of Michigan acting through Governor John M. Engler had failed to negotiate with them in good faith regarding the formation of Tribal–State compacts, as required the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2710(d)(3)(A). The court entered a consent judgment on August 20, 1993 (docket # 100). In December 1996, defendant filed a motion to compel compliance with the consent judgment (docket # 105), which was granted in part and denied in part in March 1997 (docket # 129). The matter was appealed to the Sixth Circuit, which affirmed Judge Gibson's decision.

The matter presently is before the court on defendant's second motion to compel compliance with the consent judgment (docket # 153). Judge Gibson having since retired, the matter was reassigned to me. I have considered the briefs of the parties and amicus curiae and the parties' presentations at oral argument on December 14, 1999. For the reasons that follow, I DENY defendant's motion.

## I.

The Tribes filed the instant action in July 1990, alleging that Governor Engler had failed to negotiate in good faith with them as required under the IGRA, 25 U.S.C. § 2710(d)(3)(A). After three years of litigation, the parties reached a settlement agreement, and Judge Gibson entered a consent judgment disposing of the action.

The consent judgment, entered on August 20, 1993, provides for dismissal of the complaint "on the express condition that each tribal party and the Governor shall execute a class III gaming compact, which shall be concurred in by resolution of the Michigan Legislature, and that those compacts are thereafter approved by the United States Secretary of the Interior and pursuant to 25 U.S.C. § 2710(d)(8)." Consent Judgment, ¶¶ 3, 7, at 2, 4. Under the consent judgment, the Tribes are required to make semi-annual payments to the Michigan Strategic Fund "in an amount equal to eight percent (8%) of the net win at each casino derived from all class III electronic games of chance . . . ." Consent Judgment, ¶ 4, at 2. The Tribes are required to continue to make these payments "only so long as there is a binding class III compact in effect between each tribe and the State . . . , and then only so long as the tribes collectively enjoy the exclusive right to operate electronic games of chance in the State . . . ." Consent Judgment, ¶ 5, at 3. This court retains jurisdiction to enforce the consent judgment. Consent Judgment, ¶ 9, at 4.

On November 5, 1996, Michigan voters approved "Proposal E," which provided for the adoption of an initiated law permitting casino gaming in described Michigan cities. *See* Michigan Gaming Control and Revenue Act (the "Act"), Mich. Comp. Laws §§ 432.201 *et seq.* At the time of passage of the initiative, the only city meeting the

---

**1.** The Sault Ste. Marie Tribe of Chippewa Indians, Grand Traverse Band of Ottawa and Chippewa Indians, Keweenaw Bay Indian Community, Hannahville Indian Community, Bay Mills Indian Community, and Lac Vieux Desert Band of Lake Superior Chippewa Indians originally filed the action. The consent judgment added a seventh plaintiff, the Saginaw Chippewa Indian Tribe of Michigan. Plaintiffs will be referred to collectively in this opinion as "the Tribes."

definition provided under the law was Detroit. *See* Mich. Comp. Laws § 432.202(f).

Shortly after the initiative was passed, the Tribes notified the Governor that they no longer would make the semi-annual payments to the state as required under the consent judgment, because they no longer enjoyed "the exclusive right to operate electronic games of chance in the State .... " Consent Judgment, ¶ 5, at 3. The Governor filed his first motion to compel, arguing that until another person or entity actually was operating a casino, the Tribes retained their exclusive right to operate under the Consent Judgment. The Tribes, in contrast, contended that as soon as the law permitted some other group to operate a casino, the terms of the consent judgment released the Tribes from semi-annual payments.

Judge Gibson analyzed the language of the consent judgment and rejected the positions of both parties. He determined that the term "exclusive right to operate" was unambiguous:

> Under the plain and ordinary meaning of the terms, the Tribes enjoy the exclusive "right to operate" so long as the Tribes are the only persons or entities who have and can exercise the "right to operate" electronic games of chance in the State or, in other words, as long as all others are prohibited or shut out from the "right to operate" such games

*Sault Ste. Marie Tribe of Chippewa Indians v. Engler ("Sault Ste. Marie Tribe I ")*, No. 1:90–cv–611, slip op. at 7 (Mar. 17, 1997). Judge Gibson specifically rejected the Governor's position that the Tribes were obligated to pay under the consent judgment until such time as another entity actually was operating a casino. *Id.* at 10. Judge Gibson determined, however, that no person or entity actually had a right to operate a casino at the time the Act became effective. He held that no person or entity would receive a "right to operate" in Michigan until the Michigan Gaming Control Board issued a license to operate a casino to such person or entity, at which time the Tribes' right to operate would cease being exclusive. *Id.* As a result, Judge Gibson held that the Tribes were required to continue to make semi-annual payments until a license to operate was issued by the Michigan Gaming Control Board to a particular person or entity.

The Tribes appealed to the Sixth Circuit. *See Sault Ste. Marie Tribe of Chippewa Indians ("Sault Ste. Marie Tribe II") v. Engler,* 146 F.3d 367 (6th Cir.1998). The Governor did not appeal Judge Gibson's determination that the Tribes were not required to prove that another entity actually operated a casino gambling facility, only that such entity had the right to operate a facility. On appeal, therefore, the Sixth Circuit considered only the Tribes' argument that once the Act became effective, the operation of electronic games of chance were no longer prohibited in Michigan and therefore, at that time, the Tribes' rights ceased being exclusive. The Sixth Circuit held that the district court correctly defined "exclusive" as "limited to possession, control or use by a single individual or group." *Id.* at 372. The court noted that the definition is in the disjunctive, requiring possession, control *or* use, and does not require proof of all three elements. *Id.* at 373. The court held that at the time of the decision, only the Tribes had the right to operate electronic games of chance. The court noted that "[t]he Tribes can point to no one who is infringing their right." *Id.* The court therefore affirmed the district court, holding that the "the Tribes maintain their exclusive right until another group receives a casino license." *Id.*

Subsequently, on December 19, 1998, the Michigan legislature approved four new gaming compacts with four additional, non-plaintiff Indian tribes.[2] Those com-

---

2. The four new tribes whose tribal-state compacts received approval were the Nottawaseppi Huron Band of Potawatomi, the Little River er Band of Ottawa Indians, the Pokagon Band of Potawatomi Indians, and the Little Tra-

pacts were approved by the Secretary of the Interior and published in the Federal Register on February 18, 1999. The Tribes contend that, pursuant to the terms of the compacts, as of February 18, 1999, the compacts became effective and the new tribes acquired the right to operate electronic games of chance. As a result, the Tribes contend that after February 18, 1999, the Tribes no longer are required to pay semi-annual payments to the state pursuant to the contract. In contrast, the Governor contends that, pursuant to the Sixth Circuit's prior decision, the Tribes are required to make semi-annual payments until gaming licenses are issued by the new tribes authorizing particular gaming facilities under the terms of their tribal-state compacts. *See* Def. Ex. 2–5, § 4(C), at 6.

## II.

In his motion to compel, the Governor contends that this matter is controlled by the doctrine of the law of the case. Specifically, the Governor makes a three-step argument. First, he observes that in the concluding clause of the Sixth Circuit decision in *Sault Ste. Marie Tribe II* the court held that "the Tribes maintain their exclusive right until another group receives a casino *license*." *Id.* at 373 (emphasis added). Second, he notes that under the new tribal-state compacts, the new tribes are required to "*license*, operate, and regulate all Class III gaming activities pursuant to this Compact, tribal law, IGRA, and all other applicable federal law." Compacts, Def. Ex. 2–5, § 4(c) (emphasis added). As a consequence, he asserts, pursuant to *Sault Ste. Marie Tribe II*, until the new tribes fully license gaming activities under the compact, the plaintiff Tribes retain the exclusive rights to operate gaming activities.

I disagree. The Governor's argument turns on a linguistic sleight-of-hand. As I discuss further *infra*, because the meaning of the word "license" as used in the previ-

ous decisions is both factually and legally distinct from the meaning of the word "license" in the tribal-state compacts, the Sixth Circuit's prior decision is not controlling of the issue before this court.

In *Sault Ste. Marie Tribe I*, Judge Gibson determined when the Tribes' "exclusive right to operate electronic games of chance" could be said to be terminated under the Michigan Gaming Control and Revenue Act, Mich. Comp. Laws §§ 432.201 *et seq.* Judge Gibson specifically addressed the Tribes' argument that they ceased to have the exclusive right to operate when the Act became effective, thereby permitting the licensing of casino gambling in Detroit. Judge Gibson held that mere enactment of the legislation was not sufficient to terminate the exclusivity of the Tribes' right to operate electronic gaming. Instead, he held that the Tribes would lose their exclusive right to operate only "when under the Act some other person or entity receives and may exercise a 'right to operate' electronic games of chance." *Sault Ste. Marie Tribe I*, slip op. at 9. In the context of the Michigan Gaming Control and Revenue Act, he held that licensing by the Michigan Gaming Control Board represented the grant of permission to operate to a particular group. In *Sault Ste. Marie Tribe II*, 146 F.3d 367, the Sixth Circuit affirmed Judge Gibson's decision in its entirety.

Thus, in the prior motion to compel, both courts considered and decided only what action taken under the Michigan Gaming Control and Revenue Act would convey a right to operate electronic gaming to another entity. The courts held that the issuance of a license by the Michigan Gaming Control Board conveyed that right.

In the instant case, the Michigan Gaming Control Board has no authority to issue licenses with respect to tribal gaming covered by the compacts. Instead, tribal gaming on Indian lands is not governed by

verse Bay Bands of Odawa Indians (hereafter     "new tribes").

state law, but is instead governed by the tribal-state compact and the IGRA. *See* Compacts, Def. Ex. 2–5, §§ 1(I), 4(C), 8. The compacts expressly state that the new tribes are permitted to conduct casino operations on tribal lands. *See* Compacts, Def. Ex. 2–5, § 3(A) ("The Tribe may lawfully conduct the following Class III games on eligible Indian lands ...."). The compacts therefore specifically provide that as of the effective date of the compacts, the new tribes "have and can exercise the 'right to operate' electronic games of chance." *Sault Ste. Marie Tribe I*, slip. op. at 9. Thus, the effect of licensing by the Michigan Gaming Control Board under the Act—to convey a right to operate a casino to a non-tribal entity—is created for tribes by entry into a tribal-state compact.

In contrast to the effect of licensing by the Michigan Gaming Control Board, the licensing referred to in the compacts, refers to a requirement that the new *tribes* license *the gaming operations*. In other words, the licensing under § 4(C) of the compacts has to do with the manner in which the operations and facilities are conducted by the new tribes, not with who has a right to operate games of chance. In fact, under the IGRA, the Tribes are not permitted to transfer the right to operate to an entity other than the tribe. *See* 25 U.S.C. § 2710(B)(2)(A), 2710(D)(1)(A)(ii) (requiring that tribes hold "the sole proprietary interest in and responsibility for the conduct of any gaming activity ...."). Thus, the licensing referenced in the compacts is both legally and conceptually distinct from licensing by the Michigan Gaming Control Board: tribal licensing under the compacts may never result in assignment of the right to game to an entity other than the tribe itself.

In sum, the word "license" has an entirely different meaning in the court of appeals decision than in the tribal-state compacts. Neither the district court nor the court of appeals was asked to address the effect of possible tribal-state compacts with new tribes, and a determination of the present issue was not necessary to the prior decision. The use of the word "license" in the Sixth Circuit decision applied to an entirely different type of license and is inapplicable to the question now before the court. The court's language therefore does not constitute law-of-the-case for purposes of this issue. *See United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir.1994) (law of the case doctrine implicated only when issue was expressly or impliedly decided in earlier decision in case); *Hanover Ins. Co. v. American Engineering Co.*, 105 F.3d 306, 311 (6th Cir.1997) ("The 'law of the case' doctrine precludes a court from 'reconsideration of identical issues.'") (quoting *Petition of U.S. Steel Corp.*, 479 F.2d 489, 493 (6th Cir.), *cert. denied*, 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973)).

Nevertheless, while interpretation of the effect of the word "license" in *Sault Ste. Marie Tribe II* is not dispositive as to the effect of the tribal licensing contemplated by the compacts, the determinations of the district court and court of appeals as to how the agreement should be interpreted and the meaning of "exclusivity" *do* constitute the law of the case. This court, therefore, must apply the reasoning of the prior decision rendered by Judge Gibson and the affirmance of that reasoning by the Sixth Circuit.

As I previously observed, both the Sixth Circuit and the district court held that a right is "exclusive" when "limited to possession, control or use by a single individual or group." *Sault Ste. Marie Tribe II*, 146 F.3d at 372. The court held that the definition was stated in the disjunctive and therefore required the existence of one of the three elements of "possession," "control" or "use" of the right by another, but that the Tribes "need not show all three elements to prove exclusivity." *Id.* at 373. The district court specifically held that "the Tribes lose their 'exclusive right to operate' when some other person or entity receives and may exercise a 'right to operate' the games." *Sault Ste. Marie Tribe I,*

slip op. at 9. The court of appeals agreed and held that the Tribes could not demonstrate the loss of their exclusive right because they could "point to no one who is infringing their right" by way of possession, control or use of a right to game. *Sault Ste. Marie Tribe II*, 146 F.3d at 373.

In the present motion, in contrast, the Tribes are able to point to four new groups who, following approval of the compacts, possess the right under Michigan law to operate electronic games of chance. Under the compacts, each new tribe expressly is granted permission to "lawfully conduct ... Class III games on eligible Indian lands." *See* Compacts, Def. Ex. 2–5, § 3(A). Pursuant to the terms of the compacts, that permission to conduct games of chance became effective on the day the compacts were approved by the Secretary of the Interior and published in the Federal Register, or February 18, 1999. Thus, in contrast to the circumstances previously addressed by Judge Gibson and the Sixth Circuit, following approval and publication of the compacts, the new tribes "possessed" a right to operate casinos and were no longer "shut out" from operating electronic games of chance. *Id.* at 372. As a result, according to the reasoning of both the district court and the court of appeals in the earlier motion, to the extent the new tribes possessed a right to operate electronic games of chance, the Tribes no longer possessed an exclusive right to operate electronic games of chance.

In light of the plain meaning of the consent judgment and the tribal compacts, as well as the analysis applied by both the district court and the Sixth Circuit on the prior motion to compel, the Tribes' right to operate ceased being exclusive when that right was extended and became effective as to the new tribes. As a consequence, the Tribes no longer "enjoy[ed] the exclusive right to operate electronic games of chance in the State ...." as of February 18, 1999, when the four new tribal-state compacts were published in the Federal Register.

### III.

For the foregoing reasons, the Tribes' obligation under the consent judgment to pay semiannual payments to defendant terminated when tribal-state compacts with four new tribes became effective. As a result, as of February 18, 1999, the Tribes were no longer required to make payments to the state under the terms of the agreement. Accordingly, defendant's motion to compel compliance with the consent judgment (docket # 153) is **DENIED**.[3]

### *ORDER*

In accordance with the opinion filed this date,

**IT IS ORDERED** that defendant's motion to compel compliance with the consent judgment (docket # 153) is **DENIED**.

**IT IS FURTHER ORDERED** that the motion of Lac Vieux Dessert Band to strike the affidavit of Lance Boldrey (docket # 155) is **DENIED** as moot.

---

**3.** Plaintiff Lac Vieux Dessert Band also has moved to strike the affidavit of Lance Boldrey (docket # 155) on the grounds that it states bare legal conclusions not properly considered the subject of affidavit. I agree that the affidavit contains certain impermissible legal conclusions. This court, however, is capable of distinguishing between legal argument and factual statements and of according the proper weight to any such affidavit. Moreover, in light of my determination on the merits of the Governor's motion to compel, the issue is moot. Accordingly, the motion to strike is **DENIED** as moot.